UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| | : ECF Case |
| ANETHA BARFIELD, | : |
| | : |
| Plaintiff, | : 05 CV 6319 (JSR) (THK) |
| | : |
| vs. | : |
| | : |
| NEW YORK CITY HEALTH AND HOSPITALS | : |
| CORPORATION and BELLEVUE HOSPITAL | : |
| CENTER, | : |
| | : |
| Defendants. | : |
| | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Dated: New York, New York
        April 12, 2006

Of Counsel:

Lorie E. Almon (LA-4937)
Gerald L. Maatman, Jr. (pro hac vice)
Christopher H. Lowe (CL-0218)
Alison Cahill Siravo (AS-5656)

SEYFARTH SHAW LLP
1270 Avenue of the Americas, Suite 2500
New York, New York 10020-1801
(212) 218-5500

Attorneys for Defendants
New York City Health And Hospitals Corporation and
Bellevue Hospital Center

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... iii

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTS ........................................................................................................................ 2

III.    ARGUMENT .............................................................................................................. 3

        A.      PLAINTIFF WAS NOT JOINTLY EMPLOYED BY DEFENDANTS ............... 3

                1.      Plaintiff Dismisses And Misconstrues As Secondary Controlling
                        Second Circuit Precedent. ............................................................................ 3

                2.      Plaintiff Wholly Ignores The Fact That There Is No Subterfuge To
                        Avoid Compliance With The FLSA, Rather, Defendants Engage
                        Referral Agencies Out Of The Necessity To Provide Safe, Quality
                        Patient Care. ................................................................................................. 5

                3.      As Plaintiff Admits – And Now Attempts To Contradict –
                        Bellevue's Supervision Of Plaintiff Was Limited To Ensuring
                        Patient Safety And, Therefore, Is Not An Indicia Of Joint
                        Employment. ................................................................................................. 8

                4.      Bellevue Does Not "Schedule" Agency Personnel And Its
                        Approval Of Plaintiff's Hours Is Not An Indicator Of Joint
                        Employment. ............................................................................................... 10

                5.      The Agencies Controlled Plaintiff's Wages And Performed Other
                        Traditional Employer Duties ...................................................................... 11

                6.      The Referral Agencies Have Multiple Clients, Send Their
                        Employees To Multiple Facilities, And Plaintiff Was Free To
                        Work Elsewhere .......................................................................................... 13

                7.      Plaintiff's Reliance on Pre-Zheng, Non-Authoritative Sources
                        Does Nothing To Further Her Claim. ......................................................... 14

                8.      Plaintiff's Assumption That Any Employer Who Engages A
                        Referral Agency Is A Joint Employer Is Fundamentally Erroneous
                        Under Zheng. ............................................................................................... 16

        B.      EVEN ASSUMING THAT PLAINTIFF WAS JOINTLY EMPLOYED
                BY DEFENDANTS, DEFENDANTS CANNOT BE LIABLE FOR ANY
                FLSA VIOLATION. ........................................................................................... 17

                1.      Plaintiff Circumvented Known Rules Prohibiting Overtime Work .......... 17

i

2.    Plaintiff Is Not Entitled To Liquidated Damages Because
Defendants Made Good-Faith Efforts To Comply With The FLSA
And Reasonably Believed That Their Payroll Practices Did Not
Violate The FLSA......................................................................................19

IV.    CONCLUSION..............................................................................................................21

ii

# TABLE OF AUTHORITIES

## CASES

Adams v. Debevoise & Plimpton,
No. 03 Civ. 3051 (AKH), 2004 WL 1737826 (S.D.N.Y. Aug. 3, 2004) .................................16

Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
611 F. Supp. 344 (S.D.N.Y. 1984).......................................................................... 16-17

Ansoumana v. Gristede's Operating Corp.,
255 F. Supp. 2d 184 (S.D.N.Y. 2003).................................................................17

Bennett v. Progressive Corp.,
225 F. Supp. 2d 190 (N.D.N.Y. 2002) ................................................................15

Cooper v. McKinney,
No. 78-0252, 1979 WL 1920 (D.D.C. July 31, 1979) ..........................................18

Darrikhuma v. Southland Corp.,
975 F. Supp. 778 (D. Md. 1997) .........................................................................18

Forrester v. Roth's I.G.A. Foodliner, Inc.,
646 F.2d 413 (9th Cir. 1981) ..............................................................................18

Garcia v. Pace Suburban Bus Serv.,
955 F. Supp. 75 (N.D. Ill. 1996) ...........................................................................9

Goldberg v. Whitaker House Coop., Inc.,
366 U.S. 28, 33 (1961)......................................................................................3, 4

Hayes v. New York City Department of Corrections,
84 F.3d 614 (2d Cir. 1996)..................................................................................10

Hojnacki v. Klein-Acosta,
No. 00 C 1356, 2001 WL 289786 (N.D. Ill. Mar. 15, 2001) ..................................9

Kiper v. Novartis Crop Prot., Inc.,
209 F. Supp. 2d 628 (M.D. La. 2002)....................................................................7

Mack v. United States,
814 F.2d 120 (2d Cir. 1987)................................................................................10

Mackey v. Unity Health System,
No. 03-CV-6049T(F), 2004 WL 1056066 (W.D.N.Y. May 10, 2004) .............15, 16

Miller v. Defiance Metal Products,
    989 F. Supp. 945 (N.D. Ohio 1997).................................................................15, 16

Moreau v. Air France,
    356 F.3d 942 (9th Cir. 2004) .................................................................................16

Newton v. City of Henderson,
    47 F.3d 746 (5th Cir. 1995) ............................................................................18, 19

Pabst v. Oklahoma Gas & Electric Co.,
    228 F.3d 1128 (10th Cir. 2000) .............................................................................19

Perma Research & Dev. Co. v. Singer Co.,
    410 F.2d 572 (2d Cir. 1969).................................................................................10

Pfohl v. Farmers Insurance Group,
    No. CV-03-3080 DT, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004)......................12

Quintanilla v.  A & R Demolition Inc.,
    No. Civ.A. H-04-1965, 2006 WL 568308 (S.D. Tex. Mar. 6, 2006)...................................8-9

Rutherford Food Corp. v. McComb,
    331 U.S. 722 (1947)..........................................................................................3, 4

Sowemimo v. D.A.O.R. Sec., Inc.,
    43 F. Supp. 2d 477 (S.D.N.Y. 1999).......................................................................7

Theisen v. City of Maple Grove,
    41 F. Supp. 2d 932 (D. Minn. 1999)..................................................................19, 20

Walton v. United Consumers Club,
    786 F.2d 303 (7th Cir. 1986) .................................................................................19

Zheng v. Liberty Apparel Co.,
    355 F.3d 61 (2d Cir. 2003)..................................................................... *passim*

## STATUTES & REGULATION

Fair Labor Standards Act, 29 U.S.C. § 201, et seq. .............................................. *passim*

29 U.S.C. § 203(g) ......................................................................................................3

29 U.S.C. § 260............................................................................................................19

Family Medical Leave Act, 29 U.S.C. § 2617 ..........................................................16

29 C.F.R. § 791.2 ........................................................................................................3

Defendants New York City Health and Hospitals Corporation ("HHC") and Bellevue Hospital Center ("Bellevue") (collectively, "Defendants"),[1] by and through their attorneys Seyfarth Shaw LLP, hereby oppose and respond to Plaintiff's Motion for Summary Judgment ("Motion") and respectfully submit that, for the reasons stated below, as well as for the reasons set forth in Defendants' Motion for Summary Judgment, the Court should deny Plaintiff's motion.

## I.     PRELIMINARY STATEMENT

As set forth in Defendants' Motion for Summary Judgment, neither HHC nor Bellevue jointly employed Plaintiff, thus, they cannot be held liable for any alleged violation of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (the "FLSA").   Nothing in Plaintiff's Cross-Motion for Summary Judgment changes that conclusion.   In her motion, Plaintiff largely attempts to circumvent the "economic realities" test on joint employment issues, as set forth in Zheng v. Liberty Apparel Co., 355 F.3d 61, 72-73 (2d Cir. 2003).   Plaintiff relies almost exclusively upon an opinion letter issued by the Department of Labor before the Second Circuit's holding in Zheng, as well as irrelevant portions of the Family and Medical Leave Act.   These sources are neither controlling nor persuasive in any way.    It is beyond dispute, however, that Zheng is the controlling authority in this Circuit on issues of joint employment status under the FLSA, which is the only issue presently before this Court.   And as Zheng and its progeny make clear, the mere fact that some quality control mechanisms were utilized by a third-party to monitor Agency Personnel cannot alone create a joint employment relationship.   Instead, Zheng

---

[1] While HHC and Bellevue are named separately as defendants herein, Bellevue is, as with all other facilities of HHC, an operating division of HHC.   See N.Y. Unconsol. ch. 1016 (1969). Given Plaintiff's characterization, however, for convenience sake, HHC and Bellevue will be referred to herein as "Defendants."

1

instructs that the key question is whether Bellevue's use of referral agencies was a subterfuge or sham arrangement to avoid paying Plaintiff overtime. Nothing in Plaintiff's motion papers even suggests that this was the case. To the contrary, Bellevue made substantial and continuous efforts to fill its vacant CNA positions by posting jobs where Plaintiff and other agency CNAs would learn of the vacancies and hopefully apply. Plaintiff was well aware of these opportunities to become an HHC employee, but chose not to take them so that she could maintain maximum flexibility with respect to her work schedule.

Furthermore, Plaintiff's account of the record is inaccurate. Indeed, Plaintiff impermissibly contradicts her own deposition testimony and mischaracterizes the sworn statements of HHC personnel. Plaintiff cannot simply ignore the plain record evidence, which shows not only that her purported statements of material fact are disputed, but in fact that the record evidence points conclusively to the fact that summary judgment in favor of Defendants is warranted. In short, neither controlling Second Circuit precedent nor the record support Plaintiff's motion. Plaintiff's motion for summary judgment should therefore be denied.

## II. FACTS

Defendants contend that there are no <u>material</u> facts in dispute in this case, as evidenced by Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1. Defendants do dispute, however, a good number of the averments set forth in Plaintiff's Statement of Material Undisputed Facts ("Pl.'s 56.1 Stmt."), as they are unsupported by the citations referenced therein and/or based upon Plaintiff's impermissible contradictory declaration. Defendants' response to Plaintiff's Statement of Material Undisputed Facts, with accurate record citations, is set forth in Defendant's Counterstatement of Material Facts ("Defs.' Stmt."), submitted herewith.

NY1 26413327.1

### III.     ARGUMENT

**A.     PLAINTIFF WAS NOT JOINTLY EMPLOYED BY DEFENDANTS**

1.     <u>Plaintiff Dismisses And Misconstrues As Secondary Controlling Second Circuit Precedent.</u>

Controlling Second Circuit precedent calls for the denial of Plaintiff's motion for summary judgment.  In her motion papers, Plaintiff attempts to downplay the significance of <u>Zheng v. Liberty Apparel Co.</u>, 355 F.3d 61, 72-73 (2d Cir. 2003).  As the governing Second Circuit interpretation of Department of Labor Regulations applicable to a joint employer analysis under the FLSA, however, the court's holding cannot be ignored.[2]  As <u>Zheng</u> emphasizes, therefore, a joint employer analysis must be based on the "'circumstances of the whole activity,' viewed in light of 'economic reality.'"  <u>Id.</u> at 71 (quoting <u>Rutherford Food Corp. v. McComb</u>, 331 U.S. 722, 730 (1947), <u>Goldberg v. Whitaker House Coop., Inc.</u>, 366 U.S. 28, 33 (1961)).

The Second Circuit's joint employer test unequivocally explains that, at bottom, what a Court must decipher is whether a particular contractor relationship is a mere sham arrangement to avoid compliance with the FLSA.  <u>Zheng</u>, 355 F.3d at 72-73; <u>see</u> <u>also</u> 29 U.S.C. § 203(g); 29 C.F.R. § 791.2 ("A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the [FLSA] depends upon all the facts in the particular case.").  With this background in place, the Second Circuit identified in <u>Zheng</u>, with no particular order or weighting, the following relevant factors to be considered: (1) whether the defendant's premises and equipment were used for the

---

[2]  Plaintiff, in her Complaint, recognized that the analysis set forth in <u>Zheng</u> was material to her claims.  (Declaration of Christopher H. Lowe, dated March 20, 2006 ("Lowe Decl.") ¶ 2, Exh. M, ¶¶ 27, 31-41).  Only after discovery provided Plaintiff with no support of the premise that Defendants engaged in a sham arrangement with referral agencies and that, in fact, the "whole circumstances" demonstrate nothing more than a necessary relationship, did Plaintiff relegate <u>Zheng</u> to simply one authority among many.

plaintiff's work; (2) whether the referral agencies had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which the plaintiff performed a discrete line job that was integral to defendant's process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the defendants supervised plaintiff's work; and (6) whether the plaintiff worked exclusively or predominantly for the defendants.  Id. at 72.

Although the Zheng Court utilized the above six-factor test to analyze the "economic reality" of the particular contractor relationship at issue in that case, it made explicit its holding that a joint employer analysis must ultimately decipher whether such relationship is but a sham arrangement to avoid compliance with the FLSA based on "'the circumstances of the whole activity,' viewed in light of 'economic reality.'" Zheng, 355 F.3d at 71 (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947), Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961)).  As such, each factor alone is not dispositive; rather, they are a "nonexclusive and overlapping set . . . intended to expose outsourcing relationships that lack a substantial economic purpose." Zheng, 355 F.3d at 75-76.  Here, the evidence cited by Plaintiff does not in any way suggest that a sham existed to avoid paying overtime to Plaintiff.  To the contrary, the full record makes clear that Bellevue sought to hire Plaintiff as a direct employee and that she – and she alone – opted not to accept a Bellevue staff position.  (Defs.' Stmt. ¶¶ 10d-10e, 10g-10h).

Furthermore, the Zheng court emphasized that its holding should not be interpreted "to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA."  Id. at 76.  Accordingly, as Plaintiff fails to acknowledge, the factors set forth in Zheng are couched as a "nonexclusive and overlapping set . . . intended to expose outsourcing relationships that lack a substantial economic purpose" and a court interpreting Zheng  "is also free to consider any other

factors it deems relevant to its assessment of the economic realities."  Id. at 71-72, 75-76. Plaintiff misconstrues Zheng as a secondary assessment without considering the purpose behind its fact-intensive test: to determine whether a contracting relationship is a subterfuge to avoid compliance with the FLSA.  Id.

In her moving papers, Plaintiff relies heavily on certain factors considered by the Zheng court, and attempts to mischaracterize the record evidence to suggest that application of the test compels the determination that Plaintiff was Defendants' employee.  Plaintiff's argument misses the forest for the trees; as the Zheng court repeatedly emphasized, the factors to be considered are intended to be neither binding nor exclusive.  Instead, consistent with long-standing Supreme Court precedent, the Second Circuit directed that "the circumstances of the whole activity [should be] viewed in light of economic reality."  Id. at 71 (internal quotations omitted).  As discussed below, there is no question that the contractual, arms-length relationship between Bellevue and the staffing agencies serves legitimate business purposes and is in no way intended to avoid compliance with the FLSA.

> 2.      Plaintiff Wholly Ignores The Fact That There Is No Subterfuge To Avoid Compliance With The FLSA, Rather, Defendants Engage Referral Agencies Out Of The Necessity To Provide Safe, Quality Patient Care.

As described above, the focus of the Zheng joint employer analysis is to segregate contracting relationships established without legitimate economic purpose from relationships, like the Defendants', in which outsourcing is an industry necessity.  See Zheng, 355 F.3d at 76. By virtue of her proposed interpretation of Zheng, Plaintiff misses the overarching purpose of the test: to determine whether Bellevue's relationships with referral agencies are a sham arrangement to avoid the FLSA's mandates.  Id.

5

Plaintiff's motion is devoid of any mention of the reality facing acute care hospitals such as Bellevue and, accordingly, completely lacks the "whole circumstances" consideration that a joint employer analysis under <u>Zheng</u> demands.  <u>See Zheng</u>, 355 F.3d at 71.  It is precisely the unique circumstances faced by acute care hospitals which force most, including Bellevue, to resort to supplementing their nursing staff with Agency Personnel.[3]  (Defs.' Stmt. ¶ 10a). Bellevue – out of sheer medical and legal necessity, and as a last resort – must engage referral agencies to fill the holes in its nursing staff.  (Defs.' Stmt. ¶¶ 10a-10d, 24-25a, 42, 48b).  Like most acute-care hospitals, Bellevue is experiencing a nursing shortage and, despite every effort to utilize its own employees for its staffing needs, this is not always feasible.  <u>Id.</u> ¶¶ 10b-10c. Furthermore, when compounded with the constant fluctuation of acuity levels and patient numbers, the availability of trained, certified nursing personnel available to fill unavoidable and unpredictable holes is imperative.  <u>Id.</u> ¶¶ 10a-10b.  Bellevue simply has no alternative but to engage referral agencies.  Under such circumstances, Bellevue's use of referral agencies is plainly not a sham arrangement.

The most telling fact, however, is that Bellevue repeatedly attempted to hire Plaintiff as an employee, at which point it would unquestionably incur both contractual and statutory obligations to provide her with premium payments for overtime hours worked. (Defs.' Stmt. ¶ 10e-10g).  Yet it was Plaintiff's election <u>not</u> to join Bellevue's staff as a CNA.  (Defs.' Stmt. ¶ 10e).  Indeed, Plaintiff's motion papers do not even mention that <u>she</u> – and she alone – elected to remain Agency Personnel when Bellevue, in its constant pursuit to fill its vacant positions, posted job openings for which Plaintiff was qualified.  <u>Id.</u> ¶¶ 10a-10e, 10g-10i.  These openings

---

[3]     For purposes of this memorandum, Defendants will refer to HHC employees as "Staff" and to employees of third-party referral agencies as "Agency" or "Agency Personnel."

6

were conspicuously displayed in the nursing administration office where Plaintiff reported before and after every shift.  Id. ¶ 10i.  It is wholly illogical to claim that Defendants were engaged in a sham to avoid compensating Plaintiff with overtime premium pay when she could have been hired by Bellevue as a staff employee, but unilaterally decided against applying for open positions.  See Zheng, 355 F.3d at 72; see e.g., Kiper v. Novartis Crop Prot., Inc., 209 F. Supp. 2d 628, 637 (M.D. La. 2002) (finding individuals not employees, but independent contractors where they requested that they be retained as contractors rather than as employees in lieu of the employment benefits that they would have received), aff'd, 67 Fed. Appx. 252 (2003) (table). Plaintiff admitted that despite these openings, she did not apply and preferred the flexibility inherent in remaining Agency Personnel.  (Defs.' Stmt. ¶ 10h-10i).

Plaintiff testified both at her deposition and before this Court that she placed greater weight on the freedom to create her own schedule than on the many rights and benefits she could have received as a Bellevue Staff member.  Id. ¶¶ 10e-10f, 10h-10i.  Plaintiff acknowledged, in fact, that she would have received increased pay, certain seniority and job security rights, progressive discipline and grievance protections, health insurance and retirement benefits, and holiday, shift differential and overtime premium pay.[4]  Id. ¶ 10e.  Instead, Plaintiff elected to dictate her hours and schedule, allowing her to merely inform her referral agency of her need for a month off annually to visit family in Guyana.  Id. ¶ 10h.  As a Bellevue employee, as Plaintiff is aware, she would be required to submit vacation requests covering a year's time, would be

---

[4]      The fact that Plaintiff, as an Agency employee, is not a member of the collective bargaining unit applicable to CNAs is an indicator that there is no joint employment relationship between the referral agencies and Bellevue.  See Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999) (observing that where a plaintiff is not a member of the defendant's bargaining unit, it is a indicator that weighs against a finding of joint employment).  Here, as Plaintiff herself admits, she was in no way a participant in the collective bargaining unit applicable to Bellevue CNAs.  (Defs.' Stmt. ¶ 25a).

awarded vacation according to seniority, and would be restricted in how much vacation time she could take and when it would be taken.  Id. ¶ 10h.  Plaintiff has every right to enjoy such flexibility, but should not be heard to now complain that Defendants did not provide her with all the benefits of employment.

At bottom, Plaintiff's minimized and overly-literal application of Zheng belies the fatal deficiencies in her motion papers.  The simple question posed in Zheng – whether the defendant engaged in a sham or subterfuge to avoid paying overtime premium pay – is easily answered here:  no such subterfuge existed.  Plaintiff's own admissions explain that it was by her choosing that she remained an Agency CNA.  (Defs.' Stmt. ¶¶ 10e, 10h).  Plaintiff did not – because she cannot – offer any evidence whatsoever that Defendants' relationships were in any way an effort to avoid paying overtime premium pay.

      3.      As Plaintiff Admits – And Now Attempts To Contradict – Bellevue's Supervision Of Plaintiff Was Limited To Ensuring Patient Safety And, Therefore, Is Not An Indicia Of Joint Employment.

Even if this Court were to rely heavily on the six factors specifically cited in Zheng, the record evidence shows that such factors support the conclusion that no joint employment relationship existed between Defendants and Plaintiff.  Despite her contrary assertions in her 56.1 Statement, Plaintiff unequivocally testified at her deposition that she was not supervised at Bellevue except for supervision related to ensuring the delivery of essential medical care in a safe manner.  (Defs.' Stmt. ¶¶ 24-25).  As the Zheng Court took care to explain, supervision related to the quality of the services provided by a contractor's employee is "perfectly consistent with a typical, legitimate subcontracting arrangement."  See Zheng, 355 F.3d at 75.  Furthermore, where supervision of a contractor's employees is limited to ensuring to safety and security, it has no bearing on the joint employment analysis.  See id.; see, e.g., Quintanilla v.

A & R Demolition Inc., No. Civ.A. H-04-1965, 2006 WL 568308, at *2 (S.D. Tex. Mar. 6, 2006) (finding plaintiff's statement that he received directions from defendant did not raise a fact issue as to whether plaintiff was jointly employed by defendant because, quoting Zheng, this would "classify nearly all subcontracting relationships as joint employment relationships – a result that finds no support either in the law or in our country's commercial practices") (Tab A)[5]; Hojnacki v. Klein-Acosta, No. 00 C 1356, 2001 WL 289786, at *4 (N.D. Ill. Mar. 15, 2001) (finding medical director employed by private company that provided medical care to prisons was not jointly employed by prison simply because he was subject to the prison's safety regulations and rules) (Tab B), aff'd, 285 F.3d 544 (7th Cir. Mar. 28, 2002); Garcia v. Pace Suburban Bus Serv., 955 F. Supp. 75, 76 (N.D. Ill. 1996) (applying economic realities test, and observing that defendant's requirement that contractor's personnel adhere to safety and reporting guidelines, while not involving itself in the day-to-day management of the contractor, meant that defendant could not be deemed a joint employer under the FLSA); see also, Defendants' Memorandum of Law In Support of Their Motion for Summary Judgment ("Defs.' Mem.") at 18.

As Plaintiff testified, her work was supervised to ensure that quality, essential medical care was provided to Bellevue's patients.  (Defs.' Stmt. ¶ 24).  And she further acknowledged that patients' health and lives are dependent upon proper patient care.  Id. ¶ 30.  Underscoring the need for this minimal level of supervision, Bellevue could lose accreditation status along with Medicare and Medicaid funding were it to permit Agency Personnel to engage in unsupervised patient care.  Id. ¶¶ 24-25.  Accordingly, under Zheng, Defendants' limited supervision of

---

[5] Copies of all unreported decisions cited herein are annexed at Tabs A through D for the Court's convenience.

Plaintiff's patient care, to ensure it is delivered in a quality and safe manner, does not weigh in favor of joint employment.  See Zheng, 355 F.3d at 75-76.

Moreover, Plaintiff may not now contradict her sworn testimony with her self-serving declaration.  It is well-settled that "a party may not create an issue of fact by submitting an affidavit in [connection with] a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  Hayes v. New York City Dep't of Corrs., 84 F.3d 614, 619 (2d Cir. 1996).  Indeed, "'[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'"  Id., 84 F.3d at 620 (quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)); see also Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("[A] party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.") (collecting cases).  Accordingly, Plaintiff cannot simply avoid her prior sworn deposition testimony – namely that she was not supervised but for the provision of essential medical care – by attaching a contradictory assertion to her summary judgment papers.  (Defs.' Stmt. ¶¶ 24-25).

4.    Bellevue Does Not "Schedule" Agency Personnel And Its Approval Of Plaintiff's Hours Is Not An Indicator Of Joint Employment.

Plaintiff's motion papers do not accurately reflect the record evidence concerning how Bellevue requests the services of Agency Personnel for specific tours.  The record shows that, unlike its own employees, Bellevue does not "schedule" Agency Personnel.  Instead, it merely requests that Agency Personnel call-in up to two hours prior to a shift in order to see if their services are necessary or, if – on the other hand – it can utilize its own employees to fill a staffing void.  Id. ¶¶ 48-49.  The call-in procedures underscore the business necessity of

10

engaging referral agencies.  Id. ¶¶ 48-49, 54.  This permits Bellevue to attempt to fill any nursing staffing needs with its Staff for overtime premium pay prior to resorting to Agency Personnel – as is Bellevue policy and required under various collective bargaining agreements.  Id. ¶¶ 48a-48b, 51.  Furthermore, Agency Personnel may simply request that their referral agencies not assign them for any period of time.  Id. ¶ 10h.  This is simply not an option for Bellevue Staff. Id.

Again, as Zheng emphasizes, the crux of an FLSA joint employer analysis is uncovering the true nature of the particular contracting relationship.  See Zheng, 355 F.3d at 72.  Evidence that Bellevue first offers overtime premium pay to its Staff before resorting to Agency Personnel is dispositive proof that referral agencies are not a matter of preference to Bellevue, but a matter of medical necessity.  (Defs.' Stmt. ¶¶ 10b-10c, 48a-48b, 51).  Given the unique, volatile environment of an acute care hospital, coupled with the industry-wide nursing shortage, Bellevue simply has no other option.  Id.  ¶¶ 10a-10c.

Plaintiff's motion papers also contend that Bellevue's review of Agency Personnel hours in order to ensure it is invoiced properly is somehow an indicator of a joint employment relationship.  Bellevue's review of Agency Personnel hours is not nearly as elaborate as Plaintiff contends.  Bellevue merely ensures that is invoiced properly for services actually provided by the particular referral agency.  (Defs.' Stmt. ¶¶ 27, 53, 57-58, 62-63).  It is good business – and common sense – that Defendants engage in such a practice, and not in any way an indicator of joint employment.

5.  The Agencies Controlled Plaintiff's Wages And Performed Other Traditional Employer Duties.

Plaintiff's motion papers also omit a key indicator of the true, benign relationship between Bellevue and the referral agencies; namely, that the latter performed all traditional

11

employer duties and controlled Plaintiff's wages.  Bellevue contracted with referral agencies and, according to its terms, paid them a flat hourly rate for their services, dependent only on the nursing level provided.  Id. ¶¶ 12a, 18-19, 44, 57.  It remained – at all times – solely the responsibility of the referral agency to compensate its employees and to determine the manner in which to do so.  Id. ¶¶ 18-19, 44.  Bellevue did not control the manner, nor the amount of compensation that the referral agencies provided their employees.  Id.  Bellevue had no role whatsoever in the payment of wages to Plaintiff or to any other Agency Employee.  Id.

Plaintiff relies on impermissible speculation in asserting that Bellevue "controlled" her wages by paying the agencies a flat rate.  If true, Plaintiff's contention would place all vendor relationships within the realm of joint employment which, as clearly emphasized in Zheng, is simply not the intent of the FLSA.  See Zheng, 355 F.3d at 73-75; see, e.g., Pfohl v. Farmers Ins. Group, No. CV-03-3080 DT, 2004 U.S. Dist. LEXIS 6447, at *9, 18 (C.D. Cal. Mar. 1, 2004) (finding defendant not joint employer where it engaged an outside personnel company and paid it a flat rate; instead finding that defendant did not control the rate or method of payment simply by setting the rate) (Tab C).  As Plaintiff admits, it is the referral agencies that solely determine the payroll methods for their employees; withhold taxes and Social Security; and issue her IRS Forms W-2.  (Defs.' Stmt. ¶¶ 14a, 18-19, 45).  Moreover, Plaintiff understood that it was the referral agencies' responsibility, as her employer, to compensate her for any overtime premium pay she earned.  Id. ¶¶ 18-19, 45a.  Also, her employers – not Bellevue – offered her certain fringe benefits, including medical insurance.  Id. ¶ 14b.

What the record does make clear, moreover, is that the referral agencies interviewed Plaintiff, screened her, hired her, and ensured that she was trained and certified to join their staff. (Defs.' Stmt. ¶¶ 21-21f).  The referral agencies performed the background checks and ensured

12

that Plaintiff was properly certified and trained as required under the law.  Id.  Simply put, the referral agencies employed, compensated and performed all traditional employer duties and thus permitted Bellevue to simply orient Agency Personnel to its facilities and maintain a personnel file as required by law.[6]  Id.  Indeed, Plaintiff herself viewed the referral agencies as her employer as she, for example, applied for and received unemployment benefits from them. (Defs.' Stmt. ¶ 14).

      6.     <u>The Referral Agencies Have Multiple Clients, Send Their Employees To Multiple Facilities, And Plaintiff Was Free To Work Elsewhere.</u>

Plaintiff's motion papers attempt to portray the referral agencies as interchangeable sham entities, when in fact, the record demonstrates plainly that referral agencies are highly successful businesses servicing multiple public and private clients.  (Defs.' Stmt. ¶¶ 12b-12c).  Again, however, admissible evidence does not support her characterization of the record.  Bellevue has non-exclusive relationships with eleven different referral agencies.  Id. ¶ 12a.  Each referral agency employs hundreds, even thousands, of nursing personnel.  Id. ¶ 12c.  For example, Medical Staffing Network, Inc. ("MSN") employs 28,000 healthcare professionals and has a client base of over 7,000 facilities in 40 states.  Id.  As Zheng explains, if a subcontractor services multiple clients, this weighs against a finding of joint employment because there is less likely to be a subterfuge arrangement.  Zheng, 355 F.3d at 72.  The referral agencies are free to send their employees to any of their many clients and this remains the case for Agency employees assigned to Bellevue.  (Defs.' Stmt. ¶¶ 20, 22, 29).

---

[6]     Plaintiff argues that Bellevue's maintenance of what is referred to as Agency employee's profile somehow is an indicator of joint employment.  This simply is not the case.  New York law requires that Bellevue maintain the records kept in the profile.  (Defs.' Stmt. ¶¶ 60, 65).

Plaintiff's own testimony is instructive on this point. Plaintiff explained that after Bellevue requested that UltraCare, Inc. ("UltraCare"), her employer, no longer assign her to Bellevue, it would continue nonetheless to send her to its other clients. Id. Plaintiff was clearly tied to her own employer, rather than to Bellevue. Id.; see Zheng, 355 F.3d at 72. Plaintiff's continued employment with UltraCare, therefore, was not contingent on her continued assignment at Bellevue. Id.

       7.      <u>Plaintiff's Reliance on Pre-Zheng, Non-Authoritative Sources Does Nothing To Further Her Claim.</u>

It may also be worth noting that the authority upon which Plaintiff does rely is outdated, non-controlling and superceded by <u>Zheng</u>. In her brief, Plaintiff heavily relies on a May 11, 2002 Department of Labor ("DOL") opinion letter ("May Opinion Letter") from a member of the Wage and Hour Division. (Pls. Mem. at 9-10). As a threshold issue, as the Wage and Hour Division explains, only certain of its letters are "official ruling[s] or interpretation[s] of the Wage and Hour Division" of the Department of Labor (annexed to the Declaration of Christopher H. Lowe dated April 12, 2006 ("Lowe Opp. Decl.") ¶ 1, Exh. A). Only those opinion letters signed by the Administrator of the Wage and Hour Division are "official ruling[s] or interpretation[s]".[7] Id. The May Opinion Letter relied on by Plaintiff is merely signed by a member of the Fair Labor Standards Team within the Wage and Hour Division – not by the Administrator of the Wage and Hour Division. Accordingly, the Team Member's opinion is not an official ruling or interpretation for precedential purposes. Pls. Exh. 34; Lowe Opp. Decl. ¶ 2, Exh. A.

---

[7]    As described in its March 22, 2006 statement on www.dol.gov, the Wage and Hour Division now denotes non-Administrator letters, like the May 11, 2002 letter, as "NA" and they "do not constitute rulings or interpretations" of the Wage and Hour Division. (Lowe Decl. ¶ 2, Exh. A).

Furthermore, as the DOL itself explains, DOL opinion letters are "exclusively based on the facts and circumstances described [to the DOL] . . ." and the "[e]xistence of any other factual or historical background not contained in your request might require a different conclusion."  Pls. Exh. 34 at 3.  Accordingly, the surrounding circumstances of the particular hospital at issue in the May Opinion Letter – and the other opinion letters cited to by the Plaintiff for that matter – differ from Plaintiff's facts.  Id.  Significantly, nothing in the May Opinion Letter suggests that the DOL considered the unique circumstances here presented, where, for example,  Defendants actively recruited to fill the nursing shortage; Plaintiff viewed postings for open positions as a CNA; and herself decided to remain Agency Personnel.  (Defs.' Stmt. ¶¶ 10d-10e, 10g-10i).  The DOL, therefore, did not opine on this and – notably – cautions that "the opinion is based exclusively on the facts and circumstances described in your request."  Pls. Exh. 34. Accordingly, the May Opinion Letter is simply not entitled to deference.  Id.; see Bennett v. Progressive Corp., 225 F. Supp. 2d 190, 218 (N.D.N.Y. 2002) (observing that an opinion letter sought from defendant from the DOL is not binding on the Court, as the FLSA inquiry is a legal one in which the Court must make its own factual findings not based on any one parties' characterization of the issue).

Perhaps most notably, the May Opinion Letter was issued prior to the Second Circuit's ruling in Zheng.  The Second Circuit had the option to consider the DOL's 2001 position at the time it issued its holding, and nevertheless, in 2003, made clear its ruling that an overall economic realities test should control a joint employer analysis under the FLSA.

Similarly, Plaintiff's reliance on Mackey v. Unity Health System, No. 03-CV-6049T(F), 2004 WL 1056066, at *1, 3 (W.D.N.Y. May 10, 2004) and Miller v. Defiance Metal Prods., 989 F. Supp. 945, 945-47 (N.D. Ohio 1997), is unavailing, as such cases are fully distinguishable

from the situation presented here.  In both <u>Mackey</u> and <u>Miller</u>, the plaintiffs were <u>permanent</u> employees placed originally by referral agencies and, furthermore, the courts' "joint employer" analysis was under the Family Medical Leave Act, 29 U.S.C. § 2617 ("FMLA").  <u>See Mackey</u>, 2004 WL 10506066, at *1, 3; <u>Miller</u>, 989 F. Supp. at 945-47.  The regulations promulgated under the FMLA codify the relationship between a "temporary or leasing agency" as one ordinarily of joint employment with the client.  <u>See Mackey</u>, 2004 WL 10506066, at *3; <u>Miller</u>, 989 F. Supp. at 947.  No such regulation exists under the FLSA.  Furthermore, neither court provided the fact-intensive analysis similar to that required under <u>Zheng</u>.  <u>Id</u>.  Accordingly, the analysis is not analogous to <u>Zheng</u> and, therefore, is not persuasive.

        8.     <u>Plaintiff's Assumption That Any Employer Who Engages A Referral Agency Is A Joint Employer Is Fundamentally Erroneous Under Zheng.</u>

Plaintiff's contention that any employer that engages a referral agency is a joint employer ignores the fundamental fact that the joint employer analysis under <u>Zheng</u> is not based on one dispositive fact but rather seeks to uncover the economic realities behind a contactor relationship through the application of a "nonexclusive and overlapping" set of factors.  (Pls. Mem. at 11); <u>Zheng</u>, 355 F.3d at 71-73; <u>see</u>, <u>e.g.</u>, <u>Moreau v. Air France</u>, 356 F.3d 942, 953 (9th Cir. 2004) (finding defendant not joint employer with temporary agency).

Plaintiff relies on factually distinguishable case law for support of her blanket, erroneous proposition.  For example, Plaintiff relies on two cases in which the temporary employee was an administrative assistant in a corporate setting – a far cry from the unique circumstances that plague a healthcare institution necessitating Defendants' reliance on Agency Personnel.  <u>See</u> <u>Adams v. Debevoise & Plimpton</u>, No. 03 Civ. 3051 (AKH), 2004 WL 1737826, at *1 (S.D.N.Y. Aug. 3, 2004) (Title VII plaintiff worked as a temporary legal secretary at a law firm directly supervised by his attorneys); <u>Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 611 F.

16

Supp. 344, 349 (S.D.N.Y. 1984) (plaintiff, in a Title VII context, was assigned as temporary administrative assistant and was directly supervised by Merrill Lynch).  The remaining case relied upon by Plaintiff, Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 185 (S.D.N.Y. 2003), is equally distinguishable as plaintiffs were delivery workers for the grocery-store-defendant.  Once again, the grocery delivery industry simply cannot be compared to that of a healthcare institution seeking to ensure appropriate staffing to provide quality, safe patient care.  (Defs.' Stmt. ¶¶ 10a-10c).  Furthermore, as the Court implicitly states in Ansoumana, there is no reason – other than financial – why the delivery workers could not have been hired by the defendant.  Ansoumana, 255 F. Supp. 2d at 195.  Ansoumana clearly is inapposite to Plaintiff's relationship with Bellevue:  she – like all Agency Personnel – elected to be employed by the referral agency rather than join Bellevue's staff; she neglected to apply for the multiple job openings for which she was qualified; and Bellevue must maintain staffing levels despite a nursing shortage.  (Defs.' Stmt.  ¶¶ 10a-10e, 25).

**B.    EVEN ASSUMING THAT PLAINTIFF WAS JOINTLY EMPLOYED BY DEFENDANTS, DEFENDANTS CANNOT BE LIABLE FOR ANY FLSA VIOLATION**

1.    Plaintiff Circumvented Known Rules Prohibiting Overtime Work.

Even assuming, *arguendo*, that Plaintiff was jointly employed by Defendants (which she was not), there is no basis for holding Defendants liable for any FLSA violation because Plaintiff was not permitted to work more than forty hours a week.  Indeed, UltraCare prohibited all its employees from working overtime for any client – including Defendants – although it duly compensated Plaintiff on the only known occasion that she worked more than forty hours in a week through UltraCare.  (Defs.' Stmt. ¶¶ 21c, 45-45b).  To enforce its permissible overtime prohibition, UltraCare required Plaintiff and its other employees to "sign in" and "sign out" at

17

the beginning and end of each shift, which permitted UltraCare to track the number of hours each employee worked.  Id. ¶ 21c.  Plaintiff was well aware of this prohibition, as UltraCare clearly advised her that she was not permitted to work overtime.  Id. ¶¶ 21c, 45a.  When Plaintiff approached Bellevue management regarding overtime compensation, she was referred back to UltraCare, which reiterated its no-overtime policy.  Id. ¶ 45a.  Nonetheless, Plaintiff brazenly violated this rule, and made it impossible for UltraCare or anybody else to monitor her hours, by manipulating the process and signing in through multiple agencies.  Id. ¶ 45b.  Notably, as Bellevue was not Plaintiff's employer, it did not, as it does for its own employees, track Plaintiff's weekly hours or overtime, nor was it required to do so. Id.  Bellevue treats referral agencies like any other vendor; merely verifying amounts invoiced prior to payment. Accordingly, Bellevue was wholly unaware of Plaintiff's efforts to subvert UltraCare's policy.

It is well-established that where, as here, an employer has a policy prohibiting overtime work and the employee deliberately prevents the employer from becoming aware of any overtime hours she works, the employer does not violate the FLSA by failing to pay for the overtime hours.  See Newton v. City of Henderson, 47 F.3d 746, 749 (5th Cir. 1995); see also, Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d 413, 414 (9th Cir. 1981) ("[W]here an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207.") (emphasis added); Cooper v. McKinney, No. 78-0252, 1979 WL 1920, at *2 (D.D.C. July 31, 1979) (Tab D); Darrikhuma v. Southland Corp., 975 F. Supp. 778, 781 (D. Md. 1997).

Under these circumstances, even if Plaintiff could establish that Defendants were her joint employers – they were not – Plaintiff cannot establish an FLSA violation because

18

Defendants have a right to require Plaintiff to adhere to their procedures.  See Newton, 47 F.3d at 749.  As a result, this Court should deny Plaintiff's motion for summary judgment.

2.     Plaintiff Is Not Entitled To Liquidated Damages Because Defendants Made Good-Faith Efforts To Comply With The FLSA And Reasonably Believed That Their Payroll Practices Did Not Violate The FLSA.

The record plainly establishes that Defendants could not have acted willfully toward Plaintiff because, as explained above, they were wholly unaware of her furtive efforts to sign in through multiple agencies.  Moreover, it is undisputed that Defendants made good-faith efforts to comply with the FLSA, and reasonably believed that they were not legally required to compensate Plaintiff for any overtime hours worked.  Thus, even assuming, *arguendo*, that Plaintiff could establish that Defendants were her joint employer – which she cannot – she would not be entitled to liquidated damages.

It is well-settled that this Court may dismiss a claim for liquidated damages where, as here, the employer acts in "good faith" and can demonstrate "reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]."  29 U.S.C. § 260.  To satisfy the good-faith standard, an employer must demonstrate that it had an honest intention to ascertain and comply with the requirements of the FLSA.  See Pabst v. Oklahoma Gas & Elec. Co., 228 F.3d 1128, 1137 (10th Cir. 2000) (affirming denial of liquidated damages because, *inter alia*, employer "acted in good faith under a reasonable, albeit mistaken, belief that its particular on-call scheme was non-compensable"); Walton v. United Consumers Club, 786 F.2d 303, 312 (7th Cir. 1986) (denying liquidated damages where employer showed good faith effort to comply with FLSA); Theisen v. City of Maple Grove, 41 F. Supp. 2d 932, 941 (D. Minn. 1999) (same).

At all relevant times, Defendants had a reasonable and good-faith belief that the referral agencies were the sole employers of Plaintiff and all Agency Employees.  (Declaration of Peter

G. Kelly, M.B.A., dated April 4, 2006 ("Kelly Opp. Decl.") ¶ 3).  As a result, Defendants paid referral agencies a flat hourly fee for the services provided by Agency Employees, which fee was intended to permit the referral agencies to pay Agency Personnel in accordance with state and federal law.  Id. ¶ 2.

Further, with respect to its own employees, Defendants made extensive good-faith efforts to ascertain and comply with the requirements of the FLSA.  Specifically, HHC's Human Resources Department routinely undertakes thorough reviews and analyses of HHC employees' job duties in order to ensure that they are properly classified as exempt or non-exempt under the FLSA.  Id. ¶ 5.  In addition, HHC's Payroll Department uses software that incorporates all relevant rules set forth in the FLSA and its collective bargaining agreements with its employees' unions.  Id. ¶ 6.  In all instances where there is a conflict between the requirements of the FLSA and collective bargaining agreement, the payroll software compensates HHC employees at the higher amount to ensure compliance with the FLSA.  Id.  HHC's Payroll Department frequently audits its payroll system to ensure that it is properly compensating its employees under the terms of the FLSA.  Id. ¶¶ 7-8.

Because Defendants have demonstrated objectively reasonable grounds for believing that they were not required to compensate Plaintiff for any overtime hours she worked, and made good faith efforts to comply with the FLSA, and because the record evidence does not remotely support the conclusion that Plaintiff was jointly employed by Defendants, Plaintiff's motion for summary judgment, both in terms of liability and for liquidated damages, should be denied.

# IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion; grant Defendants'

Motion for summary judgment; and further grant any other relief deemed necessary.

Dated: New York, New York
       April 12, 2006

SEYFARTH SHAW LLP

By  s/ Lorie E. Almon
        Lorie E. Almon (LA-4937)
        Gerald L. Maatman, Jr. (pro hac vice)
        Christopher H. Lowe (CL-0218)
        Alison Cahill Siravo (AS-5656)
1270 Avenue of the Americas, Suite 2500
New York, New York 10020-1801
(212) 218-5500

Attorneys for Defendants
New York City Health And Hospitals Corporation
and Bellevue Hospital Center

NY1 26413327.1

**TAB A**



Slip Copy                                                                                                          Page 1

Slip Copy, 2006 WL 568308 (S.D.Tex.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,S.D. Texas, Houston Division.

Rolando QUINTANILLA, et al., Plaintiffs,

v.

A & R DEMOLITION INC., et al., Defendants.

**No. Civ.A. H-04-1965.**

March 6, 2006.

Loren G. Klitsas, Klitsas & Vercher PC, Robert L. Ivey, Ogletree Deakins et al, Houston, TX, for Plaintiffs.

Larry Don Knippa, Knippa & Kral, Nancy Hesse Hamren, Coats Rose Yale et al, Houston, TX, Rose Monica Jennings, Ogletree Deakins et al, Austin, TX, for Defendants.

Andrea C. Reveile, pro se.

Raymond L. Reveile, pro se.

MEMORANDUM AND ORDER

ROSENTHAL, J.

**\*1** The plaintiffs in this FLSA collective action worked for A & R Demolition, Inc., a subcontractor on several construction sites. The plaintiffs ask this court to reconsider its August 30, 2005 memorandum and order granting summary judgment motions filed by two of the defendants, Satterfield & Pontikes ("Satterfield") and Swinerton Builders ("Swinerton"). These defendants were general contractors on the construction sites. The plaintiffs argue that the record showed sufficient evidence that Satterfield and Swinerton directed the plaintiffs' "means and methods" of work to raise fact issues as to whether those defendants are also the plaintiffs' "employers." (Docket Entry No. 68). Satterfield and Swinerton both filed responses and moved for entry of final judgment. (Docket Entry Nos. 67, 81). Based on a careful review of the parties' motions and responses, the record, and the applicable law, this court denies the motion for reconsideration and grants the motions for entry of final judgment as to Satterfield and Swinerton. The reasons are stated below.

I. Background

An extensive statement of the background of this case is set out in this court's August 30, 2005 memorandum and order

and is not repeated here. (Docket Entry No. 60). This court granted summary judgment as to the claims against Swinerton and Satterfield on the ground that the evidence would not permit a factfinder to hold them liable under the FLSA as employers of A & R's employees. (Docket Entry No. 60). The plaintiffs argue that this court failed appropriately to consider previously-submitted evidence showing that Swinerton and Satterfield exercised sufficient control over the A & R employees to raise fact issues as to whether they could be held liable as employers or as acting in the interest of the employer. (Docket Entry No. 68).

II. Analysis

"A motion to reconsider an order ... is appropriate when the court is presented with newly-discovered evidence, when the court committed clear error, when there is an intervening change in controlling law, or when other highly unusual circumstances exist." *Becerra v. Asher,* 921 F.Supp. 1538, 1548 (S.D.Tex.1996), *aff'd,* 105 F.3d 1042 (5th Cir.1997). None of these circumstances is present in this case.

No single factor is dispositive in determining whether a defendant is an "employer" under the FLSA. Courts should consider such factors as whether the purported employer's premises and equipment were used; whether liability could shift as a unit from one putative employer to another; the extent to which plaintiffs performed a discrete line-job that was integral to the purported employer's business; whether responsibility under the contract could pass from one subcontractor to another without material changes; the degree to which the purported employer supervised the plaintiffs' work; and whether the plaintiffs worked exclusively or predominantly for the purported employer. *Woolridge v. Fischbach & Moore,* 234 F.3d 706 (5th Cir.2000); *Zheng v. Liberty Apparel Co.,* 355 F.3d 61, 72 (2d Cir.2003); *see also Watson v. Graves,* 909 F.2d 1549, 1553 (5th Cir.1990); *Wirtz v. Lone Star Steel Co.,* 405 F.2d 668, 669 (5th Cir.1968); *Welch v. Laney,* 57 F.3d 1004, 1010-11 (11th Cir.1995). "[I]t is the totality of the circumstances, not any one factor, which determines whether a worker is the employee of a particular alleged employer." *Baystate Alternative Staffing, Inc. v. Herman,* 163 F.3d 668, 675 (1st Cir.1998). The plaintiffs do not contend that this court applied an incorrect legal standard.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


Slip Copy                                                                                          Page 2
Slip Copy, 2006 WL 568308 (S.D.Tex.)
**(Cite as: Slip Copy)**

**\*2** Based on this legal standard and the summary judgment evidence, this court concluded that Satterfield's and Swinerton's supervision over A & R workers did not, as a matter of law, exceed that of a "typical, legitimate subcontracting arrangement." *Zheng, 355 F.3d at 71-72.* Even extensive supervision by a general contractor over a subcontractor's employees "weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Id.* at 74-75 (quoting *Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)*).

In their motion for reconsideration, the plaintiffs focus on evidence in the summary judgment record that they contend shows that Satterfield and Swinerton supervisors hired and fired A & R workers. (Docket Entry No. 68 at 4, 7). The plaintiffs cite evidence that Wade Troxler, a Satterfield superintendent, and John Pruitt, a Swinerton superintendent, "terminated" Michael Shane Henderson, an A & R supervisor, from the Juvenile Justice Center job site. The plaintiffs also argue that a Satterfield superintendent prevented A & R from firing one of its employees, Selwyn McMorris. (Docket Entry No. 68 at 4; Docket Entry No. 56 ¶ 16).

This court previously considered the evidence cited and found that it did not raise a fact issue as to whether Swinerton's and Satterfield's supervision over A & R's employees exceeded that of a general contractor and demonstrated effective control over the terms and conditions of their employment. As discussed in the August 30, 2005 opinion, the evidence showed that Satterfield and Swinerton personnel had the right to, and did, address the A & R employees' safety violations and contract performance. (Docket Entry No. 49, Ex. B; Docket Entry No. 45, Ex. 5, at 153). Such supervision is not inconsistent with "typical, legitimate subcontracting arrangement[s]," and did not rise to the level of joint employment, based on the "circumstances of the whole activity." *Zheng v. Liberty Apparel Co. Inc., 355 F.3d at 71-72, 75; see also Garcia v. Pace Suburban Bus Serv., 955 F.Supp. 75, 77 (N.D.Ill.1996)*. As Swinerton points out in its reply, its superintendent testified that he "asked" that Henderson be removed from the job site and "couldn't do nothing" if A & R had refused to do so. (Docket Entry No.

81, p. 2). As Satterfield points out in its reply, the evidence showed that Henderson had repeated safety violations. The contract with A & R allowed Satterfield to remove an A & R employee from the job site for safety violations without creating a joint-employment relationship under the FLSA. (Docket Entry No. 73, p. 3). Evidence that Satterfield asked A & R to retain an employee does not give rise to an inference that Satterfield had the right to hire or fire A & R employees or that Satterfield was the plaintiffs' "employer."

The plaintiffs also cite deposition testimony from Jay Davlin, a former A & R vice-president, that Satterfield controlled the "means and method" of the plaintiffs' work. (Docket Entry No. 68 at 5). The plaintiffs cite the following exchange:

**\*3** Q. But there are times, and you've seen times, when the general contractor gets involved and requests the sub to follow their means and methods, correct?
A. On that project it did occur. That's-
Q. It did occur?
A. Yes.
Q. Okay. And just to make sure I understand, you said it did occur-Satterfield did direct the means and methods of A & R demolition on that job site, i.e., the Texas State Hotel-excuse me, the Texas Juvenile Justice Center?
A. The Harris County Juvenile Justice Center.
Q. And the answer to that question is yes?
A. Yes.
....
Q. Do you know who Wayde Troxler is?
A. Yes.
Q. Is he the person at Satterfield-one of the persons that would direct your means and methods out there that we talked about?
A. Yes.
....
Q. You said Wayde Troxler directed your means and methods?
A. Yes.
Q. How so?
A. I-directed what equipment I-to be utilized, which areas to work in, what procedures to utilize to achieve whatever result he was looking for.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


Slip Copy                                                                                    Page 3
Slip Copy, 2006 WL 568308 (S.D.Tex.)
**(Cite as: Slip Copy)**

(Docket Entry No. 68 at 6-7). " 'Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." ' *Dutton v. Univ. Healthcare Sys., L .L.C.,* 136 Fed. Appx. 596, at *6 (quoting *Clark v. America's Favorite Chicken Co.,* 110 F.3d 295, 297 (5th Cir.1997)); *see also Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Repeating the phrase "means and methods" does not provide competent summary judgment evidence that Satterfield and Swinerton were plaintiffs' employers, particularly given the extensive and undisputed evidence as to their general-contractor relationship to the plaintiffs' employer. The plaintiffs submitted affidavits with similarly conclusory statements; they do not controvert the record evidence that Swinerton and Satterfield were general contractors, not employers of the subcontractor's workers.

Davlin's conclusory testimony that he received specific directions from Troxler does not raise a fact issue as to whether Satterfield employed the A & R workers. *See Zheng,* 355 F.3d at 71-72. Similarly, the plaintiffs' argument that Swinerton gave directives to A & R employees does not make Swinerton's role greater than that of a general contractor. In *Zheng,* the court explained the need to use great care in determining whether a general contractor is an FLSA "employer" of a subcontractor's workers, to avoid an approach that would "classify nearly all subcontracting relationships as joint employment relationships-a result that finds no support either in the law or in our country's commercial practices." *Id.* at n. 11. In *Moreau v. Air France,* 343 F.3d 1179, 1189 (9th Cir.2003), the court held that a general contractor's supervision of a subcontractor's work was not "joint employment" because the instructions concerned the performance of the subcontract. Troxler's communications with Davlin, a former vice-president of A & R, are like those between the general contractor and subcontractor in *Moreau.* They are consistent with giving instructions regarding the performance of the contract and do not make the general contractor an employer of the subcontractor's workers.

**\*4** The record shows that Satterfield and Swinerton do not have an ownership interest in A & R. They did not pay A &

R employees or establish the prevailing wage rates. They did not maintain payroll or other records for the subcontractors' employees. They did not exercise general authority to hire and fire A & R employees. The evidence that they asked A & R to remove one superintendent from the job site because of performance issues relating to safety and encouraged A & R to retain another employee does not show a broad authority over personnel decisions. The evidence as to the specific type of instructions Swinerton and Satterfield gave A & R workers, or the frequency, does not raise a fact issue as to whether Swinerton and Satterfield had the right to control the details of the A & R employees' work, so as to become employers or joint employers as to those employees. (Docket Entry No. 49, Ex. B; Docket Entry No. 56, Ex. K, at 11). The motion to reconsider is denied.

B. The Motions for Final Judgment

Federal Rule of Civil Procedure 54(b) provides:
When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Fed. R. Civ. P. 54(b). This court granted summary judgment as to plaintiffs' claims against Satterfield and Swinerton in the August 30, 2005 memorandum and order. These defendants have no involvement in the remaining claims. There is no reason to delay entering final judgment as to both these defendants. Final judgment is entered by separate order.

III. Conclusion

The plaintiffs' motion to reconsider is denied. Final judgment as to Satterfield & Pontikes Construction, Inc. and Swinerton Builders is separately entered.

S.D.Tex.,2006.
Quintanilla v. A & R Demolition Inc.
Slip Copy, 2006 WL 568308 (S.D.Tex.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                     Page 4
Slip Copy, 2006 WL 568308 (S.D.Tex.)
**(Cite as: Slip Copy)**


• [2005 WL 3132541](#) (Trial Pleading) Defendants' Answer to Plaintiffs' Second Amended Collective Action Complaint (Oct. 24, 2005)

• [2005 WL 2578545](#) (Trial Motion, Memorandum and Affidavit) Defendant Satterfield and Pontikes Construction, Inc.'s Response to Plaintiffs' Reply to Motion for Summary Judgment (Aug. 30, 2005)

• [2005 WL 2578543](#) (Trial Motion, Memorandum and Affidavit) Defendant Swinerton Builders' Reply to Plaintiffs' Response to Motion for Summary Judgment (Aug. 29, 2005)

• [2005 WL 2578542](#) (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply to Swinerton Builders' Motion for Summary Judgment (Aug. 16, 2005)

• [2005 WL 2578533](#) (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply to Satterfield and Pontikes Construction, Inc.'s Motion for Summary Judgment (Aug. 15, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB B**



Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
Irene HOJNACKI, Plaintiff,
v.
Donna KLEIN-ACOSTA, Doretta O'Brien, Addus Health-care, Inc., and Mark S. Heaney, Defendants.

**No. 00 C 1356.**

March 15, 2001.

*MEMORANDUM OPINION AND ORDER*
KENNELLY, J.
**\*1** Defendants Donna Klein-Acosta, Doretta O'Brien, Addus Healthcare, Inc., and Mark S. Heaney have moved for summary judgment on Count 1 of plaintiff Irene Hojnacki's complaint, which sets forth a claim under 42 U.S.C. § 1983 for violation of Hojnacki's due process rights. Klein-Acosta and O'Brien have also moved for summary judgment on Hojnacki's only other claim against them, Count 5, brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f). Heaney also seeks summary judgment on Count 5 and Count 6, a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 626(c), and he seeks dismissal of Hojnacki's state law claims against him for lack of subject matter jurisdiction. Hojnacki has moved for summary judgment on the question of whether the IDOC was her "employer" for purposes of her § 1983 claim.

For the reasons stated below, the Court grants defendants' summary judgment motions but declines to dismiss the state law claims against Heaney.

BACKGROUND

Dr. Hojnacki learned in 1996 that the Illinois Department of Corrections (IDOC) was seeking a Medical Director for the women's prison at Dwight, Illinois. She called the prison to make an appointment to discuss the job and eventually interviewed with a state-employed Medical Director. The Medical Director sent Hojnacki to Coastal Correctional Healthcare, a private company that contracted with various prison facilities to provide medical care, to fill out an application for the Medical Director position, and, ultimately,

Hojnacki got the job.

Hojnacki signed a contract with Coastal providing that she was a Coastal employee, with Coastal retaining the right to transfer her to a correctional facility other than Dwight at any time. Coastal paid Hojnacki's wages and set her work hours. The contract made clear that while working at Dwight, Hojnacki represented Coastal, and that she was prohibited from doing anything, such as breaking a rule of the correctional facility, that could strain the relationship between Coastal and Dwight.

When defendant Addus Healthcare, Inc. later replaced Coastal as the medical service provider at Dwight, Hojnacki contracted with Addus for the Medical Director position. This agreement provided that Hojnacki was an at-will employee of Addus, which paid her salary, allowed her a specified amount of time off, and required that her medical services conform to state regulations as well as the regulations of the correctional facility. Hojnacki was supervised by Doretta O'Brien, the Health Care Unit Administrator at Dwight, and by Diane Kumarich, the regional director of operations for Addus.

In March 1999, O'Brien accused Dr. Hojnacki of giving a can of soda to an inmate in violation of the IDOC's security rules. On March 11, 1999, defendant Donna Klein-Acosta, Dwight's warden, wrote a memorandum to defendant Mark S. Heaney, general manager of Addus, stating:
This is to advise you that I have been informed that Medical Director Irene Hojnacki violated the policy and procedures of the Dwight Correctional Center. Dr. Hojnacki brought 7-Up into the institution and gave it to an inmate which is considered trafficking with an inmate. She had been previously advised that this procedure is against the policies of the institution.
**\*2** Bringing items into the institution for an inmate is clearly a very serious matter as well as deliberately continuing the procedure after being warned that it is inappropriate behavior. It is recommended that appropriate disciplinary action be taken that would disallow her entrance into the Dwight Correctional Center.

After receiving Klein-Acosta's memorandum, Heaney fired Hojnacki because she could no longer enter the prison and



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 289786 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Addus had no other position for her.

Hojnacki denied that she brought 7-Up to the prison and requested a hearing from Klein-Acosta so that she could prove her innocence; she also contended that Klein-Acosta and O'Brien had conspired against her. When her request for a hearing was refused, she filed this lawsuit claiming that her reputation was damaged because Klein-Acosta and O'Brien leaked news of the charge and the action taken against her to prison employees and that the news subsequently traveled throughout the prison, the town of Dwight, and eventually to Chicago.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* In determining whether a genuine issue of material fact exists, we construe all facts in the light most favorable to the nonmoving party, and draw "all reasonable and justifiable inferences" in that party's favor. *Popovits v. Circuit City Stores, Inc., 185 F.3d 726, 731 (7th Cir.1999).* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* "If the non-moving party bears the burden of proof on an issue, ... that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Larimer v. Dayton Hudson Corp., 137 F.3d 497, 500 (7th Cir.1998); see Fed.R.Civ.P. 56(e).* We deal first with defendants' motions.

### 1. Count 1

In Count 1 of Hojnacki's complaint, she alleges that defendants deprived her of liberty (her reputation), without due process of law when they failed to give her a name-clearing hearing. In *Wisconsin v. Constantineau, 400 U.S. 433 (1971),* the Supreme Court held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id. at 437.* Although

this suggests that Hojnacki should have received a name-clearing hearing before the defendants fired her, the Court later limited its holding to explain that damage to reputation in and of itself may not trigger due process concerns necessarily requiring a hearing. In *Paul v. Davis,* 424 U.S. 703 (1976), the Court explained "the words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law....[Our cases do] not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701. It is only when, because of state action, a right or status previously recognized by state law is distinctly altered or extinguished that the procedural guarantees contained in the Due Process Clause are triggered. *Id.* at 710-11.

**\*3** Thus, a government employee's liberty interest is implicated when the government, in terminating the employee, makes a charge that might seriously damage the employee's standing or association in the community or impose on the employee a stigma that would preclude her from obtaining comparable work. *See, e.g., Board of Regents v. Roth, 408 U.S. 564, 573 (1972); Dziewior v. City of Marengo, 715 F.Supp. 1416, 1423 (N.D.Ill.1989).* To show that her due process rights were violated, the government employee must establish that she was dismissed from a job or deemed ineligible for one; that the government made a false charge that stigmatized her; that the charge was published or publicly disseminated; and that the employee was deprived of a name-clearing hearing. *See Dziewior, 715 F.Supp. at 1423* (citing cases). To satisfy the stigmatizing element, the statements or charges must be more than just unflattering or insulting, and a mere charge of incompetence does not suffice; rather, the charge must involve a claim of dishonesty, immorality, or unprofessional conduct, or the like, such that the employee is effectively left unemployable in her chosen line of work or is precluded from an entire class of opportunities. *Id. at 1424* (citing *Roth, 408 U.S. at 573). See also, e.g., Nickum v. Village of Saybrook, 972 F.Supp. 1160, 1168 (C.D.Ill.1997).*



As we have stated, the right to a name-clearing hearing based on deprivation of a liberty interest in this context is limited to government employees or others who are stigmatized while being deprived of some right or status that exists under the law. *See, e .g., Ferencz v. Hairston,* 119 F.3d 1244, 1249 (6th Cir.1997). In this case, Hojnacki does not point to any tangible interest that she lost other than her job. Thus, she can survive summary judgment on Count 1 only if she provides evidence from which a jury could find that she was an employee of the IDOC.

> FN1. Plaintiff has cited no case in which a person working as an employee of a company doing business with a government agency has been held to have been deprived of a liberty interest when her employment with the company was terminated as the result of allegations by the government. In *Kartseva v. Department of State,* 37 F.3d 1524 (D.C.Cir.1994), the court held that a non-government employee *could* have been deprived of a liberty interest when she was denied a government-created status-a security clearance-and lost her job because of it. But even then the court did not definitively hold that the plaintiff had been deprived of liberty; rather it remanded for consideration of whether the government's action had the effect of "automatically excluding her from a definite range of employment opportunities with State or other government agencies" or "broadly precluding her from continuing in her chosen career of a Russian translator." *Id.* at 1527. Hojnacki is faced with a summary judgment motion, not a motion to dismiss as in *Kartseva,* and she has provided no admissible evidence from which a reasonable jury could conclude that she has actually been deprived of the opportunity for employment in the field of medicine as a result of the IDOC's actions.

Hojnacki concedes that she was employed by Addus and that she was technically an independent contractor of the IDOC. But, she argues, that status existed on paper only. In reality, she argues, she was either loaned from Addus to the IDOC or that the two were her joint employers. She claims that the IDOC exerted so much control over her work that it

should be considered her employer for purposes of the due process analysis. In deciding whether this is so, we look to common law standards concerning an employee's status. *See Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 322-23 (1992). In *Alexander v. North Shore Medical Hospital,* 101 F.3d 487, 492 (7th Cir.1997), the Seventh Circuit considered whether a physician with staff privileges at a hospital should be considered to be a hospital employee for purposes of Title VII. The court focused on five factors in making its determination:

(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of the skill required, including whether skills are obtained in the workplace, (3) responsibility for costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

**\*4** *Alexander,* 101 F.3d at 492 (quoting *Ost v. West Suburban Travelers Limousine, Inc.,* 88 F.3d 435, 438 (7th Cir.1996)).

Starting with the second factor, the fact that Hojnacki held a position in which she exercised her own medical judgment should not weigh heavily in the analysis, because she was hired precisely for this purpose. *See Ezekiel v. Mitchell,* 66 F.3d 894, 902 (7th Cir.1995). And Hojnacki should not automatically be considered an independent contractor of the IDOC merely because she learned her profession at medical school.

Turning to factors (3) and (4), it appears from Addus' contract that the company provided the medical supplies and physician services at the Dwight medical unit. In addition, Addus paid Hojnacki's wages and provided her fringe benefits. If Hojnacki was a state employee, she would have had to fill out a state application and would have been paid according to a state-established wage scale, neither of which was the case. Further, Hojnacki indicated that she was an employee of Addus on her W-2 tax forms. Thus the third and fourth factors of the *Alexander* test suggest that the IDOC was not Hojnacki's employer.

At the time she was terminated by Addus, Hojnacki had been the Medical Director at Dwight for several years; she says she had planned to remain in this position at the prison for the foreseeable future. But Hojnacki was aware that she could lose the Medical Director position at any time, whether because the IDOC changed contractors (as it did more than once during the time that Hojnacki worked at Dwight), or because Addus terminated her at-will employment. Thus the fifth factor likewise tilts against Hojnacki's claim that she was an IDOC employee.

The first factor, involving who controls the plaintiff's work, weighs the most heavily in the analysis. *See Alexander,* 101 F.3d at 492-93. Hojnacki did not have a supervisor as such; she was the Medical Director and was supposed to make independent medical decisions. But Addus set her work schedule, and it was her contract with Addus that made her subject to the IDOC's rules and regulations. Indeed, the IDOC did not bar Hojnacki from the prison; rather it recommended that Addus do so. The fact that Hojnacki was subject to the prison's security regulations-her main argument against summary judgment-does not make her an employee of the IDOC. In *Lambertsen v. Utah Department of Corrections,* 79 F.3d 1024, 1027 (10th Cir.1996), a Title VII case, the Tenth Circuit held that a teaching assistant who worked for a school district that provided classes at a prison was not an employee of the prison simply because she had to follow the prison's rules. The same court reached a similar conclusion in *Zinn v. McKune,* 143 F.3d 1353 (10th Cir.1998), a Title VII case which like this one involved an employee of a private firm under contract to provide medical care at a prison. The court stated that although "valid penological measures imposed to ensure safety and security within a facility may require a worker to fulfill certain conditions, those conditions do not rise to the level of 'control' for purposes of determining a worker's employment status with the correctional facility itself." *Id.* at 1357-58.

> FN2. There is one Title VII case in this district which is arguably contrary to *Lambertsen* and *Zinn* in this regard. In *Jensen v. Illinois Department of Corrections,* No. 97 C 50198, 1999 WL 218561 (N.D. Ill. April 6, 1999), the court concluded that a nurse hired by a private contractor to work at the

IDOC could maintain a Title VII claim against the agency. *Id.* at [*]3. The court based this conclusion, however, on the fact that the plaintiff was directly supervised by state employees such that the IDOC had great discretionary control over her conduct. *Id.* The same is not true here. Hojnacki, as medical director, exercised her own medical judgment, and there is no indication that any state employee told her how to do her job.

**\*5** For these reasons, the Court concludes that the evidence, viewed in the light most favorable to Hojnacki, cannot establish that she was an employee of the IDOC and therefore entitled to the constitutional protections owed to state employees who are deprived of liberty interests. The Court therefore grants summary judgment in defendants' favor on Count 1.

### 2. Counts 5 and 6

In Counts 5, Hojnacki makes a Title VII gender discrimination claim against Addus, Heaney, Klein-Acosta, and O'Brien; in Count 6, she makes an age discrimination claim against Addus and Heaney. Neither of these claims may properly be brought against the individual defendants. Title VII and ADEA claims may be brought only against the plaintiff's employer; individuals (such as supervisors) cannot be named as defendants under these statutes. *See Geier v. Medtronic, Inc.,* 99 F.3d 238, 244 (7th Cir.1996); *Williams v. Banning,* 72 F.2d 552, 554-55 (7th Cir.1995). The Court therefore grants summary judgment in favor of Heaney, Klein-Acosta, and O'Brien on Count 5 and in favor of Heaney on Count 6.

### 3. Counts 2, 3, and 4

In light of the summary judgment rulings, we are left with a complaint that includes two federal claims (under Title VII and the ADEA) against Addus only, and three state law claims against Addus and Healey. Healey argues that there is no proper jurisdictional basis to keep him in the case. The Court disagrees. Because the Court has jurisdiction of the Title VII and ADEA claims against Addus, it also has supplemental jurisdiction under 28 U.S.C. § 1367(a) of the state law claims against Addus, as those claims arise from the


Not Reported in F.Supp.2d                                                                      Page 5
Not Reported in F.Supp.2d, 2001 WL 289786 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

same transactions as the federal claims and thus form part of the same case or controversy. Healey is a co-defendant with Addus on the state law claims. Under § 1367(a), the court's supplemental jurisdiction "include[s] claims that involve the joinder or intervention of additional parties." *See, e.g., Ammerman v. Sween,* 54 F.2d 423, 424 (7th Cir.1995). It would make no sense to require Hojnacki to litigate her claims arising from her termination in two separate forums. The Court denies Healey's motion to dismiss the state law claims against him.

CONCLUSION

For the foregoing reasons, the motion of defendants Klein-Acosta and O'Brien for summary judgment [22-1] is granted, and the motion of defendants Addus and Heaney for summary judgment [20-1] is granted in part and denied in part. Plaintiff's motion for summary judgment [25-1] is denied. Summary judgment is entered in favor of all defendants on Count 1, in favor of Klein-Acosta, O'Brien, and Heaney on Count 5, and in favor of Heaney on Count 6. The case is set for a status hearing on March 22, 2001 at 9:30 a.m. for the purpose of setting a discovery and trial schedule.

N.D.Ill.,2001.
Hojnacki v. Klein-Acosta
Not Reported in F.Supp.2d, 2001 WL 289786 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:00CV01356 (Docket) (Mar. 06, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB C**

LEXSEE 2004 U.S. DIST. LEXIS 6447

**THOMAS PFOHL, et al, Plaintiffs, vs FARMERS INSURANCE GROUP, Defendant.**

**CASE NO. CV 03-3080 DT (RCx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2004 U.S. Dist. LEXIS 6447*

**March 1, 2004, Decided**
**March 1, 2004, Filed; March 5, 2004, Docketed**

**PRIOR HISTORY:** *Pfohl v. Farmers Ins. Group, 2004 U.S. Dist. LEXIS 6446 (C.D. Cal., Mar. 1, 2004).*

**DISPOSITION:** [*1] Amended motion for certification of collective acation denied. Case allowed to proceed on individual claims of Plaintiff Pfohl only.

**COUNSEL:** For Thomas Pfohl, Joe Ferro, Billy Myers, Richard Reed, Charles Erhardt, Monte Cannon, William Keith, Gary C Odem, William F Moore, David Powell, Bruno Plocharczyk, Rick Andrews, Christopher J Hudson, Larry Hall, Raoul Rico, Dowlin Mayfield, Kenneth Ray Haraughty, Chris Macey, Richard Boblitz, Plaintiffs: Derrick Fisher, LEAD ATTORNEY, Derrick Fisher Law Offices, Pasadena, CA.

For Thomas Pfohl, Joe Ferro, Billy Myers, Richard Reed, Charles Erhardt, Monte Cannon, William Keith, Gary C Odem, William F Moore, David Powell, Bruno Plocharczyk, Rick Andrews, Christopher J Hudson, Larry Hall, Raoul Rico, Dowlin Mayfield, Kenneth Ray Haraughty, Chris Macey, Richard Boblitz, Plaintiffs: Joseph E Fieschko, Jr, LEAD ATTORNEY, Joseph E Fieschko Jr & Associates, Pittsburgh, PA.

For Thomas Pfohl, Plaintiff: Stephen C Ball, LEAD ATTORNEY, Stephen C Ball Law Offices, Pasadena, CA.

For Farmers Insurance Group, Defendant: Jessie Ann Kohler, [*2] Lee T Paterson, LEAD ATTORNEYS, Winston & Strawn, Los Angeles, CA.

**JUDGES:** Dickran Tevrizian, Judge, United States District Court.

**OPINIONBY:** Dickran Tevrizian

**OPINION:**

ORDER **DENYING** PLAINTIFF THOMAS PFOHL'S AMENDED MOTION FOR CERTIFICATION OF COLLECTIVE ACTION UNDER *SECTION 216(B) OF THE FAIR LABOR STANDARDS ACT*

**I. Background**

This action is brought by Plaintiff Thomas Pfohl ("Plaintiff") against Defendant Farmers Insurance Exchange, erroneously sued as Farmers Insurance Group ("Farmers"), for overtime wages pursuant to the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 216(b)*. Plaintiff brings this action on behalf of himself and all other similarly situated employees who were employed by Farmers as temporary full-time insurance adjusters. Presently before this Court is Plaintiff's Amended Motion for Certification of Collection Action Under *Section 216(b) of the FLSA*.

**A. Factual Summary**

The following facts are alleged in the Complaint:

Plaintiff was employed by Farmers from February 26, 2002 until October 11, 2002. (Complaint, P 8.) He was paid $ 40.00 per hour, with no minimum salary, worked approximately seventy hours per week and was not [*3] paid at a rate one and a half times his normal rate for hours worked in excess of forty hours per week. (See id.) His duties consisted of working on Farmers' files involving claims submitted to Farmers for property damage and other damages alleged to be caused by the formation of mold in residential and commercial buildings. (See id.)

Plaintiff brings this action as a collective action pursuant to the Fair Labor Standards Act, *29 U.S.C. §*

*216(b).* (See id. at P 3.) All Plaintiffs were "employees" of Farmers because they were required to comply with Farmers' instructions about when, where and how they were expected to work. (See id. at P 6.) Plaintiffs have a right of recovery under the FLSA for unpaid overtime wages owed to them for hours worked in excess of forty hours per week in which their compensation was based upon the number of hours they worked each week, but they were not paid an amount equal to one and a half times their normal hourly rate for all hours worked in excess of forty hours per week. (See id. at P 5.)

**B. Procedural Summary**

On January 6, 2003, Plaintiff filed the Complaint in the United States District Court for [*4] the Northern District of California ("Northern District").

On February 3, 2003, Farmers filed its Answer in the Northern District.

On March 10, 2003, Farmers filed a Motion to Transfer Venue in the Northern District.

On April 14, 2003, the Northern District filed an Order of Transfer, transferring this action to the Central District of California. Upon receipt of this action, the action was assigned to this Court.

On August 11, 2003, this Court held a Scheduling Conference and set the following dates: Phase I discovery cutoff on November 28, 2003 and status conference on December 8, 2003.

On September 8, 2003, Plaintiff filed a Motion for Certification of Collective Action Under *Section 216(b) of the FLSA.*

On September 15, 2003, a Consent to Opt In as Class Member was filed.

On September 23, 2003, three Consents to Opt In as Class Member were filed.

On November 23, 2003, Plaintiff filed an Amended Motion for Certification of Collective Action Under *Section 216(b) of the Fair Labor Standards Act*, which is currently before this Court. n1 The previously set Status Conference was also continued to this date.

n1 Farmers filed an Opposition to this Motion, and Plaintiff filed a Reply. However, because Plaintiff submitted new evidence and raised new arguments in his Reply, Farmers was permitted to file a Sur-Reply.

[*5]

On February 10, 2004, six Consents to Opt In as Class Member were filed.

On February 12, 2004, Plaintiff filed a "Hearing Date on Motion to Amend Complaint In Action At Law March 8, 2004 at 10:00 A.M." n2

n2 Plaintiff attempted to file a Motion to Amend Complaint on January 30, 2004; however, a Notice of Document Discrepancy was issued whereby said Motion was ordered not to be filed but instead rejected because written notice of motion was lacking or the timeliness of notice was incorrect and because the proposed order was not a separate document. On February 12, 2004, Plaintiff filed this document entitled "Hearing Date on Motion to Amend Complaint in Action at Law March 8, 2004 at 10:00 A.M," and he lodged a Proposed Order. Apparently, these documents were filed in response to the Notice of Document Discrepancy; however, the Motion to Amend itself was never filed with the Court. As such, the hearing date of March 8, 2004 does not exist because no "Motion to Amend Complaint" has been properly filed with the Court. Unfortunately, it appears that Plaintiff served a Motion to Amend on Fanners, even though such motion was not properly filed, because Farmers filed an opposition to such motion.

[*6]

On February 24, 2004, three Consents to Opt In as Class Member were filed.

**II. Discussion**

**A. Standard**

The FLSA provides an "employee" with a private right of action against his "employer" when that employer fails to pay overtime wages, i.e., one and one-half times the regular rate of pay per hour, when the employee works in excess of forty hours per week. See *29 U.S.C. § § 203, 207.* An employee is also authorized to bring an action on behalf of similarly situated employees. Id. at *§ 216(b); Doe v. Advanced Textile Corp., 214 F.3d 1058, 1064 (9th Cir. 2000).* Such an action is a type of class action, known as a "collective action," for employees who are "similarly situated" to the plaintiffs and who opt-in to the suit by filing a consent in writing with the court. *29 U.S.C. § 216(b).* If employees do not optin by filing a written consent, they are not bound by the outcome of the collective action and may bring a subsequent private action. *EEOC v. Pan Am. Work Airways, Inc., 897 F.2d 1499, 1508 n. 11 (9th Cir. 1990).* A district

Case 1:05-cv-06319-JSR   Document 40   Filed 04/12/06   Page 41 of 50

Page 3
2004 U.S. Dist. LEXIS 6447, *

court may authorize the named plaintiffs in a FLSA [*7] collective action to send notice to all potential plaintiffs and may set a deadline for plaintiffs to join the suit by filing consents to sue. *Does I through XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1064 (9th Cir. 2000)*(citing *Hoffrnann-La Roche, Inc. v. Sperling, 493 U.S. 165, 169, 172, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989))*.

**B. Analysis** n3

n3 Rulings to the objections asserted by the parties shall be deemed consistent with the analysis set forth herein.

**1. Plaintiff must show that he is "similarly situated" to the purported collective action group he wishes to represent**

Based on the Standard set forth above, at issue here is whether Plaintiff and the proposed collective action group are "similarly situated" for purposes of *Section 216(b)*. "A plaintiff bears the burden of establishing that he and the class he wishes to represent are similarly situated." *White v. Osmose, Inc., 204 F. Supp. 2d 1309, 1313 (M.D. Ala. 2002). Section 216(b)* [*8] does not define "similarly situated," and the Ninth Circuit has not defined it either. The Tenth Circuit has noted that various approaches have been taken in determining whether plaintiffs are "similarly situated." See *Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1102-03 (10th Cir. 2001)*(discussing three possible approaches to the "similarly situated" analysis). As another district court in this district observed, of these approaches, the majority of courts prefer the *ad hoc*, two-tiered approach. *Wynn v. National Broadcasting Company, Inc., 234 F. Supp. 2d 1067, 1082 (C.D. Cal. 2002)*. Under this approach, the district court makes two determinations, on an *ad hoc*, case-by-case basis. See *id*. The first determination is made based on the pleadings and any affidavits that have been submitted as to whether the class should be certified. See *id*. Because of the minimal evidence at this stage, this determination is made based on a fairly lenient standard. See *id*. The second determination is made after discovery is largely complete. See *id*. There, the court weighs various factors in making a factual determination as to [*9] whether the plaintiffs are similarly situated. See *id*. Such factors include (1) the disparate factual and employment settings of the individual plaintiffs, (2) the various defenses available to the defendant which appeared to be individual to each plaintiff, and (3) fairness and procedural considerations. *Thiessen, 267 F.3d at 1103*.

In this case, the parties do not dispute that discovery has been undertaken relating to the issues of certification

of this action as a collective action. As such, the Court can proceed to the second determination discussed above and weigh relevant factors to determine whether the plaintiffs are similarly situated.

**2. The parties' contentions**

In his Motion, Plaintiff explains that an inordinate number of "mold claims" were submitted to Farmers by its policyholders during the years 2000 and 2001, and that in order to deal with this dramatic and sudden increase in this type of claim, Farmers contracted with outside personnel companies, including Continental Staffing, Inc. ("Continental"), and outside adjusting companies, including Wardlaw Claims Service, LLP ("Wardlaw"), NCA and Eberls, to hire additional adjusters on a full-time [*10] temporary basis to help Farmers' own adjusters handle this sudden influx of claims. Plaintiff himself was hired through Continental.

Plaintiff defines the class as follows:

All those individuals who were paid on an hourly basis and who were not paid overtime wages at the rate of one and one-half times their regular rate. They were generally hired in December of 2001 and thereafter. They were hired as temporary full time adjusters through personnel companies (such as Continental) or adjusting companies (such as Wardlaw, NCA or Eberls). They usually worked on mold claim files. They generally worked in the states of Texas or California. They generally worked in (or out of) permanent Farmers offices, under the direction of Farmers supervisors, the Farmers supervisors approved their time cards, and they generally performed the same tasks that permanent Farmers employees performed.

In opposition, Farmers contends that Plaintiff has presented no evidence to support his contention that he is "similarly situated" to the other individuals he seeks to represent. Specifically, it argues that there are three primary issues in which Plaintiff must demonstrate that he is "similarly situated" [*11] to the proposed collective group before a collective action may proceed in this case: (1) that Farmers was a joint employer; (2) that each of the putative plaintiffs was not paid according to the "salary basis test" or applicable fee-based regulations; and (3) that the putative plaintiffs did not meet the "duties test" of the administrative exemption. It argues that each of these requires a fact-intensive inquiry that, in this case, is not suitable to the collective action proposed by Plaintiff.

This Court examines each of these issues below.

**3. Farmers is not the joint employer of Plaintiff and even if it was, Plaintiff has not shown that he is similarly situated to the other members of the proposed collective action group with respect to each member's employment relationship with Farmers**

Independent contractors are not covered by the FLSA; that is, there must be an employer-employee relationship for liability to accrue for alleged unpaid overtime. See *Chao v. A-One Med. Servs., 346 F.3d 908, 917-18 (9th Cir. 2003).*

> Under the FLSA, "employer" includes: any person acting directly or indirectly in the interest of an employer in relation to an employee [*12] and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

*29 U.S.C. § 203(d).* Plaintiff admits that Farmers was not his direct employer. Instead, he claims that Farmers was a joint employer. Two or more employers may jointly employ someone for the purposes of the FLSA. *Bonnette v. California Health and Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983).* Joint employers are individually responsible for compliance with the FLSA. *29 C.F.R. § 791.2(a).* Determining whether the two entities may be considered "joint employers" requires consideration of the total employment situation, but should focus on four primary factors: "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette, 704 F.2d at 1470.*

Farmers contends that Plaintiff fails to provide evidence to show that Farmers [*13] was a joint employer of Plaintiff or that Plaintiff is "similarly situated" to the other individuals he seeks to represent with regard to any alleged employment relationship with Farmers. As such, this Court examines the above factors to determine whether Farmers was a joint employer of Plaintiff and whether Plaintiff is "similarly situated" to the other members of the proposed collective group with respect to the employment relationship with Farmers.

**a. power to hire and fire employees**

Farmers provides evidence that its contracts with insurance adjusting companies to provide independent contractor adjusters, such as with Wardlaw and Pilot Catastrophe Services, Inc., specifically state that the adjusters provided are independent contractors, not employee of Farmers. (Kohler Decl., Exhs. A and B at Article 6.) With respect to Continental, Farmers provides evidence that Continental required its employees to sign an employment agreement specifying that the adjusters were employees of Continental and that they had no rights or claims to employment with the client with which they worked. (See id. at P 4; Exh. C.)

In his Reply, Plaintiff contends that Farmers had the absolute [*14] power to hire and fire him. He relies on the December 20, 2001 engagement letter which specifically provides that Farmers had the option to hire the adjusters permanently at any time. He also claims that he was fired by his Farmers' supervisor. In response, Farmers disputes Plaintiff's interpretation of the evidence and further argues that Plaintiff has not shown that he is similarly situated with regard to adjusters from other companies, or even with adjusters from Continental. This Court agrees with Farmers.

The letter relied upon by Plaintiff gives Farmers the authority to hire Continental-provided workers without incurring a fee. (Reply Brief, Exh. A.) However, it is not relevant to whether Farmers had the ability to hire or fire Continental adjusters while they were employed by Continental. In fact, as stated above, the independent contractor adjusters signed contracts with Continental specifying that they had no rights or claims to employment with the client to whom they were assigned. (See Kohler Decl., P 4, Exh. C.) Furthermore, Plaintiff has presented no evidence in regard to the other contracting companies. By contrast, Farmers has shown that independent contractor adjusters [*15] from the other contracting companies Plaintiff seeks to represent were selected and assigned by those other adjusting companies, not by Farmers. (See, e.g., Bishop Decl., P 6; Kainer Decl., P9.)

With respect to Plaintiff's claim that he was fired by his Farmers' supervisor, Farmers point to Plaintiff's deposition testimony wherein he states the reason he stopped working for Farmers was because Farmers was downsizing, and he was offered a job by Continental to work on a Farmers' project in Texas which he refused. (Plaintiff Depo. at pp. 58, 61, 64-65, 81-82 and Exh. 8, attached to Warren Decl. as Exh. A.) Plaintiff admitted in his deposition that he would contact Continental, and Continental would tell him what work was available. (Id. at 56.) Moreover, even if Farmers did control the hiring and firing of Plaintiff, then Plaintiff is not similarly situated to other Continental adjusters who worked in other locations because the evidence shows that on-site Continental managers handled personnel matters at those other

2004 U.S. Dist. LEXIS 6447, *

locations. (Nguyen Decl., P 10, Shaver Decl., PP8, 10-11.)

**b. supervise and control employee work schedules or conditions of payment**

Farmers presents evidence [*16] that the Continental employees acknowledged that their employment agreement with Continental had no effect on the terms, conditions and limitations agreed to between Continental and the client (Farmers). (Kohler Decl., P 4; Exh. C.) It states that it did not have the authority to control the terms and conditions of the Continental workers' employment. (See id. at P 6; Exh. E; Shaver Decl., P 11.) It states that Farmers managers could not make personnel changes. (Shaver Decl., P 1; Kainer Decl., P 9.)

In support of his contention that Farmers had the absolute power to supervise the adjusters' work schedules and conditions of employment, Plaintiff generally states that he was supervised by Farmers' supervisors at certain assignments. He offers no specific facts whether this "supervision" related to work schedules or conditions of payment. Plaintiff attempts to meet this requirement by stating that the adjusters were only paid if their time sheets were approved and signed by their Farmers' supervisor; however, again, the approval of time sheets bears no relation to the initial setting of work schedules or the terms for payment. Plaintiff also relies on the engagement letter which [*17] states, "As a temporary employee you are expected to follow the rules, regulations, procedures and dress code of the client company to which you are assigned." Again, this general statement in the engagement letter says nothing about the control of work schedules or conditions of payment.

Moreover, even assuming Farmers had the requisite supervision and control over Plaintiff, Plaintiff presents no evidence that Farmers had the same requisite supervision and control of adjusters from other agencies. By contrast, Farmers presents evidence that it did not exercise such supervision and control, as the other contracting entities had their own supervisors on-site. (Bishop Decl., P 6; Kainer Decl., P 9; Nguyen Decl., P 6.) It also presents evidence that Continental provided supervisors who would determine the schedules and working conditions) at sites other than those at which Plaintiff worked. (Nguyen Decl., P 10; Shaver Decl., PP 8, 10-11.)

**c. determine rate and method of payment**

Farmers shows that its agreements with the entities which provide the independent contractor adjusters do not specify how the contracting entity is to pay these independent contractor adjusters, as that [*18] is a matter between the adjusting company and its workers. (Kohler Decl., Exhs. A and B at Article 4.) It states that it does not control the rate of pay or method of payment

from the contracting entity to the worker. (See Smith Decl., P 8; Martin Decl., P 6; Shaver Decl., P 11.) It does not prepare the payroll or pay wages to the adjusters. (See Hongsdusit Decl., P 8; Martin Decl., P 6.) Similarly, Farmers did not determine the pay rates to Continental workers and did not determine the method of payment to Continental workers. (Shaver Decl., P 11.)

In support of his contention that Farmers determined the rate and method of payment, Plaintiff relies on Continental's proposal to Farmers in which Continental proposed, and Farmers accepted, the $ 40.00 per hour wage rate. However, while Farmers agreed to pay Continental on an hourly rate, such agreement did not determine the payment relationship between Continental and its employees. In fact, Plaintiff admits that Continental changed its rate and method of payment to its employees, by guaranteeing a minimum weekly salary of $ 250, then going to a $ 2,650 weekly salary, then to a $ 2,250 weekly salary, then to a hourly rate with [*19] overtime. (Kohler Decl., Exhs. G-K; Reply Brief, Exh. G.) There is simply no evidence that Farmers and not Continental changed these rates. Furthermore, Plaintiff admits he does not know how adjusters from other companies were paid. (Plaintiff Depo. at 85-87.)

**d. maintain employment records**

With respect to the maintenance of employment records, Plaintiff contends that Farmers had turned over two storage boxes of employment records on these individuals to Plaintiff's counsel through discovery. In response, Farmers states that these "employment records" consisted of nothing more than timesheets and invoices used to determine the appropriate payment to Continental, and regardless, Farmers obtained many of these records from Continental in order to respond to Plaintiff's discovery request. This Court agrees with Farmers that the factthat it obtained records at Plaintiff's request is not evidence that Farmers itself maintained or controlled them. Furthermore, Plaintiff again fails to offer any evidence to show that Farmers maintained similar so-called "employment records" for adjusters supplied by other companies and therefore has not shown he is similarly situated to them in this [*20] regard.

**e. conclusion**

Thus, based on the foregoing factors, this Court finds that Plaintiff has failed to show that Farmers together with Continental was his joint employer, and even if Plaintiff were able to establish this, he has failed to show that he is similarly situated to the other members of the proposed collective group consisting of adjusters from Wardlaw, NCA and Eberls with respect to the members' employment relationship with Farmers. On this basis alone, then, denial of certification of this action as a collective action is warranted.

**4. Plaintiff has not shown that he is similarly situated to the other members with respect to the elements of the administrative exemption**

Although an employer-employee relationship may exist for liability purposes, the FLSA exempts bona fide administrative employees from its overtime pay requirements. See *29 U.S.C. § 213(a)(1)*. The administrative exemption is comprised of two parts: (1) whether the employee was paid on an appropriate salary or fee basis; and (2) whether the employee's duties satisfy the "duties test" set forth in the regulations.

Farmers argues that even if an employment relationship [*21] exists, Plaintiff has not shown that the putative collective action group is similarly situated to him in regard to the form or method of wages paid to them, and that he has not shown that the job duties of the putative group are sufficiently similar to his. This Court agrees that these are essential elements for determining the administrative exemption. As such, this Court must examine Farmers' contentions regarding these issues. However, before proceeding, this Court notes Plaintiff's claim that it is Farmers which must show that the employees meet the administrative exemption. While this is ultimately true, this substantive issue is not now before this Court. Instead, the issue presently before this Court is whether this case should proceed as a collective action. Plaintiff bears the burden of proving this, and it is for him to present evidence that all putative members were paid similarly and performed similar job duties. In other words, since Plaintiff alleges in his Complaint that he was not exempt from overtime pay requirements because he was paid on an hourly basis, he must demonstrate that he is similarly situated to the other adjusters he seeks to represent with [*22] regard to this issue.

**a. whether the employee was paid on a salary or fee basis**

To meet the requirements of the administrative exemption, the employee must have received a salary. See 29 C.F.R. § § 541.211-213. In lieu of being paid on a salary basis, an exempt administrative employee may receive his or her compensation on a fee basis. See id. at § § 541.213, 541.313(c). Fee basis compensation is "the payment of an agreed upon sum for a single job regardless of the time required for its completion." See id. at § 541.313(b).

Farmers contends that the wage payments made to the proposed collective action group differed, not only as between Continental and the other companies, but also between the Continental workers themselves. While Farmers' evidence supports this contention, this Court agrees that, at a minimum that Plaintiff has failed to show otherwise.

Plaintiff alleges he was paid by the hour by Continental, yet another Continental worker, a putative opt-in, Bill Myers, was paid in 2003 a guaranteed $ 250 base salary or a percentage of fees billed, whichever was greater; later, he was paid a flat salary of $ 2650 per week and then [*23] $ 2250 per week. (Kohler Decl., Exhs. F-J.) In August 2003, Continental again changed its method of payment to its workers - it went back to paying its adjusters by the hour, including overtime for hours worked over 40 in a week. (See id. at P 8, Exh. K.) With respect to how adjusters for other companies were paid, Plaintiff admits that he does not know how they were paid. (Plaintiff Depo. at 85-87.)

In his Reply, Plaintiff submits new affidavits; however, these affidavits state in a conclusory fashion that the individual worked for Farmers and was paid by the hour. None of them indicate for which contracting entity he/she worked. Without basic facts as to which contracting entity employed each affiant, Plaintiff has not shown that he is similarly situated to any adjuster from any company other than Continental. With respect to adjusters with Continental, Plaintiff's own evidence is in conflict. In his Reply, Plaintiff states that Continental adjusters were paid a regular flat salary rate in 2003 (Reply, pp. 3-4), but he then submits affidavits wherein each Continental worker states he worked in 2003 and was paid by the hour. (See Cannon, Capone, Erhardt, Ferro and Jackson [*24] Affidavits.) Since Plaintiff was paid by the hour while other Continental adjusters were paid on a salary basis, then he cannot represent them as being similarly situated. n4

> n4 Recognizing the problem, Plaintiff suggests that he wants to send notice only to those individuals who were paid by the hour. However, such a suggestion highlights that certification is not proper here. To determine who was actually paid by the hour would require an individualized determination and review of pay records, and such an individualized inquiry is not the purpose of a collective action.

**b. whether the employee's duties satisfy the "duties test"**

To meet the administrative exemption, the employee's primary duties must consist of (a) the performance of office work directly related to the general business operations of the employer; and (b) duties that require the exercise of discretion and independent judgment. *29 C.F.R. § 541.2(a)(1)*. The federal regulations expressly include "claim agents and [*25] adjusters" as employees who perform duties relating to the administrative operations of a business. Id. at § 541.205(c)(5).

Case 1:05-cv-06319-JSR   Document 40   Filed 04/12/06   Page 45 of 50

Page 7
2004 U.S. Dist. LEXIS 6447, *

Farmers contends that job assignments and duties of independent contractor claims representatives vary widely, even among the adjusters provided by the same company. It provides evidence that Plaintiff's own job assignments and duties varied. For example, Plaintiff was employed by Continental in February 2002, when he first began work on mold claims for Farmers. (Plaintiff Depo. at pp. 9, 27.) His initial job responsibilities were as a "file examiner." (Id.) When Plaintiff moved to adjust mold claims in Sacramento, he became a "lead adjuster," which meant he generally supervised the work of several Wardlaw independent adjusters, who performed the initial field inspections and made the initial claim valuation. (Id. at 39, 43-44, 47.) Plaintiff then worked in Oklahoma City for about four weeks as a file examiner on mold files. (Id. at 53.) After that, he worked in Sacramento as a lead adjuster, and then Continental offered Plaintiff a job assignment in Texas, but Plaintiff rejected it. (Id. at 45-58, 61-82.)

Farmers also provides evidence [*26] demonstrating that the adjusters perform widely varying job duties. (See Bishop Decl., PP 5, 10 (describing different duties of "field adjusters" provided by Wardlaw, NCA and Eberls, with duties of "office adjusters" provided by Continental); Kainer Decl., PP 6-8 (stating that Continental adjusters "were assigned duties not performed by any other independent adjusters working mold claims at that time" and describing their job duties as "lead" adjusters, while other company adjusters had different job duties); Nguyen Decl., PP 4-9 (describing that Continental adjuster duties differed in that some Continental adjusters worked as "leads," while others worked as "office adjusters," which all differed from the "field adjusting" work performed by other company adjusters); Smith Decl., P 11 (stating that some Continental adjusters were assigned to the Complex Claims Unit and made presentations with recommendations during Legal Round Table meetings with Farmers' counsel; "No other independent adjusters from other agencies had duties at all similar to this duty.")).

Plaintiff offers no details of what the individuals in the putative collective action group actually did on the job. He merely [*27] states that they all were hired to work on "the mold claims project," and then he admits that "their duties may have varied to some extent." (Reply, p. 12.) In fact, some of the affidavits filed with his Reply reveal that the putative collective action members worked on different types of claims other than mold claims. (See, e.g., Reed Affidavit, Exh. E to Reply (stating that he worked on storm claims, not just mold claims); Roy Affidavit (stating he worked as a lead adjuster in the litigated claims section)). In sum, Plaintiff fails to rebut the evidence Farmers submitted demonstrating that the adjusters perform widely varying job

duties. n5 The differing job duties and the individualized inquiry to determine whether these varying duties meet the administrative exemption preclude a collective action in this case.

> n5 In his Reply, Plaintiff argues that Farmers' claims adjusters are production workers not covered by the FLSA administrative exemption. Farmers responds that this argument is incorrect and, in any event, irrelevant to a determination of whether they are similarly situated. This Court agrees with this latter argument; it does not need to address the issue of whether the insurance claims adjusters are exempt administrative employees or production workers at this time.

[*28]

**c. The existence of an alleged common plan or policy is not dispositive**

Plaintiff argues that the proposed collective action group is similarly situated because there is "clear evidence of a single decision, policy or plan which affected all of them." He specifically states that such plan was Farmers' decision "to hire numerous independent adjusters to work on mold claims and to pay them an hourly wage, but would not pay them overtime wages in clear violation of the overtime provisions of the FLSA." Plaintiff relies on the case of *Pines v. State Farm Ins. Co., 1992 U.S. Dist. LEXIS 6972 (C.D. Cal. 1992).*

This Court finds that Plaintiff's reliance on *Pines* is misplaced. In Pines, the plaintiff sought court facilitation of the opt-in procedure based upon the plaintiff's claim under the *Age Discrimination in Employment Act* ("ADEA") that defendants denied her, and other similarly situated persons, employment on the basis of age. n6 The Court granted plaintiffs' motion for court facilitation of the opt-in procedure because plaintiffs produced substantial allegations that the defendants participated in a plan of age discrimination that affected many similarly [*29] situated people. Thus, while the Court did focus on evidence of a plan of discrimination, the issue before it did not involve the need for individualized inquiries. By contrast, in this case, the issues of the joint employer test and the administrative exemption tests of the FLSA require such individualized inquiries. As another court stated, "unlike in a discrimination case, the focus [in FLSA cases] is not on [the employer's] action, but instead on the nature of the employee's job duties in the context of the relevant exemption criteria." *Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 498; Pfaahler, 2000 U.S. Dist. LEXIS 1772, *9* (refusing to authorize FLSA collective action; distinguishing ADEA cases because, unlike FLSA cases, "in a discrimination

case, it is relatively easy to satisfy the similarly situated standard [because] a discrimination case focuses on whether the defendant had a policy of discriminating against its employees."). In sum, while a policy or plan may be relevant to the inquiry of certification, it cannot be the sole factor in light of the other issues under the FLSA.

> n6 A collective action under the ADEA incorporates the standards for a collective action under the FLSA. *Pines, 1992 U.S. Dist. LEXIS 6972, * 19.*

[*30]

### d. conclusion

Because Plaintiff has failed to show that he is similarly situated to the other members with respect to the payment of a salary and the performance of duties, the exempt or non-exempt status of hundreds of independent contractor adjusters would need to be determined on an employee-by-employee basis. This would be inefficient and impractical, thereby defeating the purpose of a collective action. See *Mike v. Safeco Insurance Co., 274 F. Supp. 2d 216, 2003 U.S. Dist. LEXIS 21438 (D. Conn. 2003)*(denying collective action certification in FLSA overtime case because plaintiff did not show similarity in job duties and job duties test would require individualized facts). This Court therefore finds that certification of a collective action is not warranted on this additional basis.

### 5. Additional reasons exist for denying certification

Farmers offers additional arguments why a *216(b)* collective action would not be appropriate. This Court agrees with these arguments. First, distinct defenses available to Farmers that would apply to disparately situated individuals do not allow for a manageable case. See *Lusardi v. Xerox Corp., 118 F.R.D. 351, 370 (D. N. J. 1987)* [*31] ("consolidation of these claims into a representative class with the attendant defenses would not provide for an efficient proceeding"). Further, all of the issues discussed so far highlight that allowing this proposed collective action is contrary to the purpose of allowing notice and a collective action to proceed - to allow "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [conduct]." *Hoffmann-La Roche, 493 U.S. at 170.* Additionally, as Farmers states, notice should be denied because Plaintiff has engaged in solicitation and has failed to come up with significant numbers of allegedly similarly situated employees who are likely to assert similar claims. See, e.g., *Bernard v. Household International,*

*Inc., 231 F. Supp. 2d 433, 436 (E.D. Va. 2002)*(collective action notice denied, in part, because there had been ads in local papers regarding the case); *Michaelson v. Arrow Transport Co., 1997 U.S. Dist. LEXIS 23665 (D. Or. 1997)*(denying notice to potential collective action members in a FLSA case where complaint failed to allege an inability to contact collective action members [*32] in the absence of court-authorized notice). Here, Plaintiff's attorneys have posted a solicitation on a nationwide independent adjusters' website. (See Warren Decl., Exh. A - Plaintiff Depo., Exh. 10.) While "Consents to Opt In as Class Member" have been filed, no information is provided regarding these purported members, and even when affidavits have been provided, the affidavits lack the requisite information regarding the issues before the Court, as explained above.

Finally, Farmers argues that the Court should deny Plaintiff's motion because Plaintiff cannot show that either he or his attorney can adequately represent the proposed collective action members. Specifically, it claims that Plaintiff has a fundamental conflict with other potential collective action members in that Plaintiff supervised the adjusters he seeks to represent and approved their time records and denied payment for work performed by them. It also claims that Plaintiff's counsel, Mr. Fisher, has a client relationship with Wardlaw and Isabelle Arnold, a potential defendant and witness in this case who is Farmers' former mold claims manager primarily responsible for the relationship with Continental. These [*33] arguments are based upon *Federal Rule of Civil Procedure 23* class action issues. While such class action issues are arguably relevant here, this Court finds that it need not make such determination in light of the analysis set forth above. Because Plaintiff has failed to show that a collective action is warranted here, issues as to his or his counsel's ability to represent such collective group are essentially moot.

### III. Conclusion

Plaintiff has failed to show that a collective action of temporary contractor adjusters supplied to Farmers through different agencies to work on mold claims is warranted here. Instead, diverse individualized factors among the proposed collective group members exist, including the factors necessary to conclude that Farmers is a "joint employer" with a number of temporary agencies, the variety of methods of payment to the proposed collective group members who were paid by flat fee, by the hour and by salary by the same and by different employers while Plaintiff allegedly was paid by the hour, and the differences between Plaintiff and each of proposed collective group members in their actual job duties [*34] and the degree to which any one individual exer-

cised independent judgment and discretion in carrying out their varying duties.

Accordingly, this Court **denies** Plaintiff Thomas Pfohl's Amended Motion for Certification of Collective Action Under *Section 216(b) of the Fair Labor Standards Act*. n7 As such, this Court will allow this case to proceed on the individual claims of this Plaintiff, Thomas Pfohl, only. This Court orders counsel for Plaintiff Thomas Pfohl to notify, in writing, all persons that have attempted to file to opt in to this purported collective action of this Court's decision to deny class certification. This will enable said parties to file their own individual lawsuits to protect whatever rights they may have.

n7 As explained above, Plaintiff has attempted to file a Motion to Amend Complaint which he desires to be heard on March 8, 2004. However, no such Motion was properly filed. According to Farmers' opposition to the Motion to Amend, Plaintiff seeks to add three state law class claims under the California Labor Code and California Business and Professions Code, to add two additional named plaintiffs, to add two additional defendants, Wardlaw Adjusting and Continental Staffing, Inc., and to add two new FLSA collective action claims against the proposed new defendants. This Court notes that in light of this Court's determination to deny this instant motion for certification of collective action, any purported Motion to Amend may be moot, or at a minimum, require revision in light of this current Order before any attempt to refile.

[*35]

IT IS SO ORDERED.

DATED: 3-1-04

Dickran Tevrizian, Judge

United States District Court

**TAB D**



United States District Court, District of Columbia.
**Eylene F. Cooper, Plaintiff**
**v.**
**Robert H. McKinney et al, Defendants.**
**Civil Action No. 78-0252**

78-0252

July 31, 1979

GREEN, D.J.

[*Statement of Case*]

**\*1** This matter was tried to the Court on July 6, 1979. Upon careful consideration of the testimony, the arguments of counsel and the entire record herein, the Court finds that the defendants are entitled to judgment in their favor.

**Findings of Fact**

This is an action by a former Federal Home Loan Bank Board (Bank Board) employee who seeks overtime compensation and liquidated damages under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 200 *et seq.*

The defendants in this action are Robert H. McKinney, Chairman of the Bank Board; Jerome S. Plapinger, Director of the Bank Board's Opinions Division, Office of General Counsel; and John D. R. Cole, Director of the U.S. Civil Service Commission's Bureau of Personnel Management Evaluation, who were sued in their official capacities.

Plaintiff complains that she worked a total of 302-1/2 hours of overtime from the date that FLSA became applicable to federal employees, May 1, 1974 to August 12, 1976.

At all times relevant to this lawsuit, May 1, 1974 through August 12, 1976, Ms. Cooper was a secretary in the Opinions Division of the Office of General Counsel, Federal Home Loan Bank Board. As such, Ms. Cooper was responsible for performing services for five to seven attorneys in the Opinions Division of the Board.

Mr. Jerome S. Plapinger was plaintiff's supervisor at the Bank Board from 1972 through August 15, 1976.

The normal business hours for the Bank Board were 8:45 a.m. to 5:15 p.m.

Plaintiff, an out of town resident, daily traveled to and from her employment in Washington, D.C., by train from Union Station.

Plaintiff initially requested overtime compensation from the Bank Board. Mr. Frank G. Healey, Director of Personnel, denied that request in a February 15, 1977 memorandum.

Plaintiff filed a similar claim for overtime compensation with the Bureau of Personnel Management Evaluation, U.S. Civil Service Commission (CSC) on February 14, 1976, which was denied by letter dated October 14, 1977.

Plaintiff appealed the CSC's decision of October 14, 1977 to the Commissioners of the Civil Service Commission. The CSC found that the issues of plaintiff's case were fully considered and concurred in the previous denial decision.

Prior to December of 1973, plaintiff was authorized to leave the Bank Board before 5:15 p.m. to take an early train home to Baltimore. In December 1973, plaintiff's early leave authorization was terminated.

Although plaintiff was free to leave the Bank Board Building after 5:15 p.m., she routinely remained after that time in Bank Board offices during the period of May 1, 1974 through August 12, 1976.

Plaintiff admitted in a letter that she remained after 5:15 p.m. in her office for her own convenience.

During the period of May 1, 1974 through August 12, 1976, plaintiff admitted to Marvalene McGowan, a secretary at the Bank Board, the she remained in her office after 5:15 p.m. for several reasons. Ms. McGowan testified that these reasons included:
(a) Plaintiff did not care for the large crowds of people in Union Station for the early trains and liked taking the later uncrowned train instead;
**\*2** (b) Plaintiff did not care for the heavy rush-hour automobile traffic she encountered in her walk from the Bank Board to Union Station after work;
(c) Plaintiff did not care to wait for her train in Union Sta-



tion because it was a cold and drafty building;
(d) Plaintiff did not not like the manner in which the early train was driven; and
(e) Plaintiff did not have any family members which she needed to get home to.

Plaintiff was never asked to perform any work after 5:15 p.m. be her supervisor or any attorney in the Opinions Division.

Plaintiff was often seen relaxing after 5:15 p.m. in the offices of the Bank Board. Plaintiff occasionally was seen reading a newspaper after the close of business.

The Opinions Division was an office with a low-pressure environment where very few items were of a priority nature.

Plaintiff was told repeatedly by her supervisor, Mr. Plapinger, that any work given her late in the day should be completed the next work day.

Plaintiff was told repeatedly by her supervisor that she was neither required nor permitted to perform any overtime work.

Plaintiff's supervisor believed that plaintiff was remaining in the office after 5:15 p.m. at her own convenience, waiting for a train.

Plaintiff's supervisor was unaware that she was performing overtime work at any time.

### Conclusions of Law

1. Violations of the Fair Labor Standards Act must be proved by a preponderance of the evidence. *Mornford v. Andrews,* [10 LC P 62,801] 151 F.2d 511 (5th Cir. 1945); *Brennan v. Braswell Motor Freight Lines, Inc., 396 F.Supp. 704 (N.D. Tex. 1975).* Plaintiff has failed to so prove any violations.

2. The statutory language "suffer or permitted to work" within 29 U.S.C. § 201 *et seq.,* and the applicable regulations means work performed with the knowledge of the employer. *Mumbower v. Callicott,* [78 LC P 33,318] 526 F.2d 1183 (8th Cir. 1975); *Secretary of Labor v. E.R. Field, Inc.,*

[73 LC P 33,063] 495 F.2d 749 (1st Cir. 1974); *Republican Publishing Co. v. American Newspaper Guild,* [16 LC P 65,008] 172 F.2d 943 (1st Cir. 1949); *Fox v. Summit King Mines,* [8 LC P 62,254] 143 F.2d 926 (9th Cir. 1944). Plaintiff's employer did not have such knowledge.

3. Pursuant to 29 C.F.R. 785.13, management must exercise its control and see that work is not performed if it does not want it performed. In the instant case, management made all reasonable efforts to see that work was not performed. Management also made every effort to notify plaintiff that she was not to perform any overtime work.

4. The Civil Service Commission's findings and ruling denying plaintiff overtime compensation are supported by substantial evidence, both oral and documentary.

5. Defendants are entitled to a judgment in their favor.

Cooper v. McKinney
Not Reported in F.Supp., 1979 WL 1920 (D.D.C.), 86 Lab.Cas. P 33,820

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.